RICHTER CONCRETE CORP., Plaintiff,

v.

HILLTOP BASIC RESOURCES, INC.,
et al., Defendants.

No. C–1–76–512.

United States District Court,
S. D. Ohio, W. D.

April 7, 1981.

Gene I. Mesh, Cincinnati, Ohio, for plaintiff.

Jacob K. Stein, Murray S. Monroe, Cincinnati, Ohio, for defendants.

## OPINION AND ORDER

HOGAN, Senior District Judge.

This is a private antitrust action brought by the Richter Concrete Corp. against Hilltop Basic Resources, Inc., a former producer of ready-mix concrete, and the Marquette Cement Co., a former supplier of cement to, among other companies, Hilltop. Jurisdiction is pursuant to 28 U.S.C. § 1337, as the plaintiff alleges violations of 15 U.S.C. §§ 1 and 2.

Trial was commenced to a jury on October 6, 1980, and at the close of plaintiff's case both defendants moved for directed verdicts pursuant to Rule 50, Federal Rules of Civil Procedure. After full hearing on the motions, and after considering the evidence in the case, the Court concluded that defendants' motions were well taken and granted them. This Opinion and Order supplements the Court's ruling from the bench.*

### I.

The Court is well aware that summary procedures, including directed verdicts, should be used "sparingly in complex antitrust litigation where motive and intent play leading roles ..." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, where a plaintiff fails to come forward with enough evidence "to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party." *Chrisholm Brothers Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1139–40 (9th Cir. 1974); *Mowery v. Standard Oil Co. of Ohio,* 463 F.Supp. 762 (N.D.Ohio), *affirmed,* 590 F.2d 335 (6th Cir. 1976). The standard to be applied in determining the appropriateness of a directed verdict in an antitrust case is—

"... whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the non-moving party. 'Substantial evidence is

more than a mere scintilla.' The evidence must be examined in the light most favorable to the nonmovant, and there can be no weighing of evidence. Finally [plaintiff] is entitled to the benefit of all *reasonable* inferences that may be drawn from its evidence."

*Chrisholm,* 498 F.2d at 1140; *Mowery,* 463 F.Supp. at 765.

Applying this standard to the present case, the Court finds both defendants are entitled to directed verdicts on all counts of the complaint.

### II.

Count I of plaintiff's complaint, arising under § 2 of the Sherman Act, alleges that:

"Defendants Hilltop and Marquette have attempted and conspired to monopolize the manufacture and delivery of ready-mix concrete in the Greater Cincinnati Metropolitan Area. In furtherance of said attempts and said conspiracy, defendant Hilltop has engaged in predatory pricing of ready-mix concrete, and has forced plaintiff Richter and other competing contractors either to lose contracts to defendant Hilltop or to take them at a loss, by submitting contract bids at unreasonably low figures. Defendant Marquette has enabled and encouraged said predatory actions of Hilltop by various means, including the making of an agreement dated December 17, 1964, pursuant to which Marquette agreed to cover one-half of any pre-income tax losses that might be suffered by Hilltop, and also agreed to assist Hilltop's acquisitions of new equipment and expansion of operations, by guaranteeing certain loans made to Hilltop by the First National Bank of Chicago and the Northwestern Mutual Life Insurance Company up to the total amount of $3,000,000.00.

"Such acts were done by the defendants for the purpose of forcing plaintiff Richter and other competitors out of the business of manufacturing, selling and delivering ready-mix concrete in the Greater

---

* See *Garrison v. Jervis B. Webb Co.,* 583 F.2d 255, 261, n. 3 (6th Cir. 1978).

Cincinnati Metropolitan Area, and enabling defendants to enjoy the profits of a monopoly position in such business."

Count I embraces two distinct claims. The first is a claim that Hilltop attempted to monopolize the production and distribution of ready-mix concrete in the Greater Cincinnati market area. The second claim is that Marquette and Hilltop conspired together for Hilltop to achieve that end. We think Count I must be so separated because plaintiff cannot logically assert that Marquette attempted to monopolize a business in which it did not even engage—the production and sale of ready-mix concrete. But the fact that Marquette was not itself engaged in the production and sale of ready-mix concrete does not perforce exclude any claim that it conspired with another company that was so engaged—in this case, Hilltop—to monopolize this particular market. *See Cape Cod Food Products v. National Cranberry Association,* 119 F.Supp. 900, 909 (D.Mass.1954). We therefore view Count I as presenting allegations of attempted monopolization against Hilltop alone, and of conspiracy to monopolize against both Hilltop and Marquette.

As proof of these and plaintiff's other claims discussed below, plaintiff introduced evidence which, when viewed in the light most favorable to it, tended to establish the events and circumstances discussed hereafter.

During the years 1961 through 1963, the Richter Concrete Corp. was the largest producer of ready-mix concrete in the Cincinnati area, with a percentage market share of approximately 31%. The Hilltop Concrete Co. was a company comprised of several divisions. Hilltop's Greater Cincinnati ready-mix concrete division was the second largest producer in the area, with a percentage market share of approximately 31%.[**] The Marquette Cement Co. was a large corporation headquartered in Chicago which supplied cement to various ready-mix concrete producers in the Cincinnati area, including both Richter and Hilltop.

** Except as otherwise noted, references in this Opinion to Hilltop's sales, prices, costs, profits or losses are to those of Hilltop's Cincinnati

On January 28, 1964, the company referred to as Old Richter was organized and chartered as a wholly owned subsidiary of the Stewart Sand & Material Co., itself a wholly-owned subsidiary of the Mississippi River Fuel Corporation. The Mississippi River Fuel Corp. was a large, conglomerate, New York Stock Exchange-listed corporation which had recently entered the cement production industry in competition with Marquette. On January 31, 1964, Old Richter acquired all of the assets of the Richter Concrete Corporation and certain assets of the Richter Transfer Co., including all its mixer trucks used in the ready-mix concrete business.

The competitive situation, then, in late January, 1964, was this: Hilltop was a relatively small, closely held corporation facing as its principal competitor, Richter, a company having the backing and financial resources of a large national corporation. Marquette, which up until Richter's acquisition by the Mississippi River Fuel Corp. had supplied cement to both Richter and Hilltop, stood to lose Richter as a cement customer—the largest ready-mix concrete producer in the Cincinnati area. On the other hand, Richter appeared to have greatly expanded its capacity for dominance in the Cincinnati market area, and the River Fuel Corp. had in Richter a major "captive customer" for its cement.

Following the River Fuel Corporation's acquisition of Richter, Hilltop and Marquette entered into negotiations designed to strengthen their respective market positions in the Cincinnati area. Hilltop devised a five year growth program of capital improvement and market expansion, and was in need of financing to implement it. Specifically, Hilltop sought to acquire new sources of aggregates, an existing concrete plant in Covington, Kentucky, a new plant site in Cincinnati, fifteen new mixer trucks in each of the five years of the program, construction of a new concrete plant in

ready-mix division, and not to those of the company as a whole.

Dayton, Ohio, and maintenance of equipment operating efficiency through a systematic program of replacement. Hilltop estimated that it would need, in addition to internally generated capital, some $3,000,000 in long term loans. Hilltop projected that if the five-year program was implemented it could attain, through market expansion and internal expansion, the following percentage market shares:

| 1964 | 30% | (actual) |
|------|-----|----------|
| 1965 | 40% | (projected) |
| 1966 | 42% | " |
| 1967 | 43% | " |
| 1968 | 43% | " |
| 1969 | 44% | " |
| 1970 | 44% | " |
| 1971 | 45% | " |
| 1972 | 45% | " |
| 1973 | 45% | " |
| 1974 | 45% | " |

Marquette, in turn, was eager to ensure the survival of Hilltop as a steady customer in Cincinnati for its cement. The parties intended that Marquette assist Hilltop in obtaining financing, and that Hilltop purchase a certain percentage of its cement requirements from Marquette.

The fruit of these negotiations was the crucial agreement between Hilltop and Marquette dated December 17, 1964. The agreement provided:

WHEREAS, Hilltop is engaged in the business of producing and selling aggregates and ready mix concrete in the marketing area of Southwestern Ohio and Northern Kentucky, comprising an important market for cement sold by Marquette; and

WHEREAS, Hilltop has prepared, and plans to proceed in accordance with, a Five Year Growth Program, a copy of which is attached hereto, made a part hereof and marked Exhibit A; and

WHEREAS, Hilltop, in order to proceed with its Five Year Growth Program, needs assistance in obtaining certain of the necessary funds to finance the said program; and

WHEREAS, River Cement Company, a competitor of Marquette, is in the process of constructing a new cement plant from which it proposes to ship cement into the said marketing area and has acquired, directly or indirectly, control of Richter Concrete Company, a substantial ready mix company serving the same marketing area in which Hilltop solicits business; and

WHEREAS, Marquette has reasonable grounds to believe that its sale of cement in the same marketing area will be substantially reduced as a result of the activities of River Cement Company; and

WHEREAS, Hilltop fears that the competitive powers of River Cement Company and Richter Concrete Company, together with changing market conditions in aggregates, will curtail its ability to maintain its volume of business in the said marketing area; and

WHEREAS, to assist Hilltop to proceed with its Five Year Growth Program, Marquette is willing to participate in the borrowing of up to $3,000,000 by Hilltop on the terms and conditions hereinafter set forth;

the agreement provided in substance that:

(1) Marquette would guarantee up to $3,000,000 of loans made to Hilltop, to finance Hilltop's five-year growth program;

(2) Marquette would supply and Hilltop would purchase from Marquette at least 37.5% of Hilltop's cement requirements at the market prices current from time to time during the life of the agreement; and

(3) Marquette would bear one-half of Hilltop's pre-income tax losses sustained in consecutive three-year periods, the first ending on February 28, 1967. This provision covered only losses sustained by Hilltop's total operations. Marquette would not be liable for losses incurred by only one of Hilltop's divisions, such as the Greater Cincinnati ready-mix concrete division, if through all its operations Hilltop made a profit.

With Marquette's guarantee, Hilltop in fact was able to obtain loan commitments of up to $2,000,000 from the Northwestern Mutual Life Insurance Co., and up to $1,000,000 from the First National Bank of

Chicago. Hilltop implemented the five-year program as planned, and in the first year its market share jumped from 30 to 40% of the total, reflecting the acquisition of the first 15 new mixer trucks and an existing concrete company in Covington, Kentucky. Thereafter, Hilltop's market share increased less dramatically, and by the end of the program in 1969, Hilltop had achieved a 44.4% share of the Cincinnati ready mix market, slightly above the projected 44%.[1]

Meanwhile, on January 22, 1965, the Federal Trade Commission issued a complaint challenging the River Fuel Corp.'s acquisition of Richter. Both Robert J. Morrison, president of Marquette, and John F. Steele, president of Hilltop, testified in 1967 before the FTC in the Richter proceedings as to terms of the Hilltop-Marquette agreement. On May 29, 1967, the FTC ruled that the River Fuel Corp.'s acquisition of Richter's assets violated the anti-merger provisions of Section 7 of the Clayton Act, and ordered it to sell the Richter business.

The River Fuel Corp. eventually found a buyer in the Collinwood Shale Brick & Supply Co. On October 11, 1972, Collinwood entered into an agreement with Old Richter to purchase for the sum of $300,000 substantially all of Old Richter's business and assets used in the production and sale of ready-mix concrete. Collinwood and the River Fuel Corp. submitted to the FTC an "Application for Approval of Sale Transaction," wherein Collinwood stated that it "intends to place initial emphasis on increasing sales volumes" of New Richter (the new Collinwood subsidiary), projecting sales of 229,000 cubic yards of concrete in its first year of operation. To put this sales projection in perspective, Old Richter sold only about 186,000 cubic yards of concrete in its final year of operation. Pending FTC approval of the sale transaction, the officers of Old Richter continued to manage the company as agents of New Richter. In due course the FTC approved the transfer, and

the parties formally closed the sale on March 20, 1973.

Thus, by October 11, 1972, or at the very latest by March 20, 1973, the original concerns which led Hilltop and Marquette to enter the 1964 agreement no longer existed. Richter had diminished considerably in strength as Hilltop's competitor (its percentage market share had declined under River Fuel Corp. ownership from approximately 27% in 1965 to approximately 17% in 1972) and Marquette no longer feared loss of its Cincinnati market for cement. In early 1972, therefore, Marquette and Hilltop considered modifying the 1964 agreement.

In particular, Marquette wanted to be relieved of its obligations under the agreement. According to the terms of the agreement, Marquette was obligated to provide Hilltop with 37.5% of its total cement requirements at prevailing market prices. The prevailing market prices, however, were frequently below the prices Marquette wanted to charge. Were it not for its contractual obligation to sell to Hilltop at competitive market prices, Marquette either would have sold cement to Hilltop at higher prices, or would not have sold to Hilltop at all. Marquette found this aspect of the agreement burdensome, and accordingly wanted it modified.

Hilltop, however, found that the agreement worked much to its advantage. The requirements portion of the agreement enabled it to obtain needed cement from Marquette in times of shortage. The loan guarantee provisions were integral terms of the loans received from Northwestern Mutual and First National of Chicago, and these terms could not be dropped without impairing the conditions of the loans to some degree. And although Hilltop had operated profitably during the life of the agreement, and had never invoked the terms of the loss-makeup provision, it derived a level of "business comfort" from its existence. No doubt, also, its existence enhanced Hilltop's

---

1. This 44.4% market share is from Hilltop's own figures. Those of the Greater Cincinnati Ready Mix Concrete Association put Hilltop's

1969 percentage market share at 35.3%. (Compare D. Exh. 580 with P. Exh. 159.)

credit worthiness. Therefore, Hilltop was reluctant to modify the agreement in any substantial manner.

Hilltop did agree, however, to reduce its purchases of cement from Marquette. In the fiscal years ending February 28, 1973, 1974 and 1975, Hilltop's actual purchases of cement from Marquette were in the range of 10–12% of its requirements.

During the period between October, 1972 and July, 1974, competition among the Cincinnati area ready-mix concrete producers was fierce. Since the quality of concrete is essentially the same regardless of who produces it, competition took the form of offering better, more efficient service, longer or weekend hours of operation, more favorable terms of payment, and, of course, lower prices. Price competition was particularly acute because general contractors, the major purchasers of ready-mix concrete, as well as the sellers of ready-mix concrete, were awarded jobs on the basis of competitive bidding. Accordingly, purchasers of ready-mix concrete actively promoted competition among the sellers by informing those who submitted quotations whether their quotations were above, below, or competitive with the other sellers. Frequently, a purchaser would tell a seller exactly what the competition was quoting, inviting the seller to meet or beat the competitor's price. This system of playing sellers off against each other served to drive prices downward. Some producers were unable to withstand this pressure. Of the approximately 25 companies selling ready-mix concrete in the Cincinnati area, several of them, including New Richter, fell by the wayside. But entry into the industry, at least on a small level, was fairly easy, and several more of the 25 companies were newcomers during the period.

Although it remained the dominant producer of ready-mix concrete during this period, Hilltop was not immune to the effects of this competition. As the largest producer with the greatest number of concrete plants and mixer trucks, Hilltop held a clear edge over the competitors in terms of being able to service large jobs or wide geographic areas. But in other respects, Hilltop had to bow to the pressures of competition. In October, 1973, for instance, Hilltop notified its customers that they would be charged a 1½% carrying charge on all late payments. But since such late payments were customary in the industry and no other concrete supplier charged for them, Hilltop's customers resisted the late payment charge as a price increase. Accordingly, Hilltop was forced to abandon the late payment policy after two months. Then, in late December, 1973, Hilltop announced a price increase effective March 1, 1974. However, none of the major Cincinnati competitors, including Richter, followed suit, and because it was thereafter quoting prices above the competition, Hilltop lost approximately 20 major contract awards in a row. In September or October, 1974, Hilltop instituted a full-load policy, requiring its customers either to take full truckloads of concrete or to pay a premium for part-loads. This policy also met with customer resistance and several customers purchased concrete from other companies because of the policy. Finally, the year 1974 brought an influx of non-union producers who could offer concrete at prices lower than could a union operation such as Hilltop. As a consequence, Hilltop's business suffered, and in the Hamilton area, its business dwindled to nothing by the end of the year. Hilltop's percentage market share declined from approximately 40% in 1972 to approximately 30% in 1974.

Hilltop's profits also suffered during the period. Although the winter months, usually from November through February or March, were traditionally bleak and unprofitable ones both for Hilltop's concrete division and the industry in general, there being little construction at this time of year, Hilltop operated profitably in its Greater Cincinnati ready-mix division and overall through the fiscal year ending February 28, 1973. Hilltop's Cincinnati division lost money through much of the fiscal year ending February 28, 1974, and closed the year with a net operating loss of $448,515. However, the company as a whole earned $48,-565 that year, and the loss-makeup provisions of the 1964 Hilltop-Marquette agree-

ment did not come into play. Then, Hilltop's Cincinnati division lost money in March through May, 1974, and in June, the mixer truck drivers began an industry-wide strike. The strike lasted through June and July, and selling no concrete at all during the strike, the division lost money during those two months as well. The Cincinnati division lost money again in August, 1974, then had only two profitable months before it headed once again into the bleak unprofitable months of November through February. Hilltop closed the fiscal year ending February 28, 1975 with net operating losses from its Cincinnati ready-mix division of $853,920, and overall losses of $1,038.047.

Thus, Hilltop's Cincinnati ready-mix division lost money overall during the twenty-two months in which New Richter did business before failing in July, 1974. The division sold its concrete during the period at an average price of $18.80 per cubic yard, while incurring average total costs of $19.88 per cubic yard. The parties have stipulated, however, that the division's average selling price over the period was above its average variable costs of production. It is only the total costs which the division failed to recover during the period.

Meanwhile, in July, 1974, having failed to earn enough from its other operations to counterbalance its losses from its Cincinnati ready-mix division, Hilltop first notified Marquette that it would probably sustain overall losses for the year, and would invoke the loss-makeup provision of the 1964 agreement. Marquette, claiming Hilltop had breached the 1964 agreement, repudiated it, and refused to cover any portion of Hilltop's losses. On November 2, 1974, Hilltop sued for a declaratory judgment that the agreement was valid and effective, and for enforcement of the loss-makeup provision. On June 6, 1979, this Court upheld Hilltop's claim against Marquette, and ordered Marquette to cover one-half of Hilltop's pre-income tax losses as per the 1964 agreement. *Hilltop Concrete Corp. v. Marquette Cement Mfg. Co.*, C–1–74–451, Findings of Fact, doc. 79 (May 7, 1979); Final Judgment, doc. 80 (June 6, 1979) (S.D.Ohio). Marquette eventually paid Hilltop approxi-

mately $760,000.00 under the loss-makeup provision.

While Hilltop suffered financially during the period, Richter fared even worse. Richter had lost money under the control of the River Fuel Corp., and proceeded to do the same under Collinwood. In its fiscal year ending April 30, 1973, Richter had a net operating loss of $303,700. In its fiscal year ending April 30, 1974, Richter had a net operating loss of $202,517. Between April 30, 1974 and the closure of operation in the Cincinnati area in July, 1974, Richter had a net operating loss of $159,460. Over the entire period, Richter sold its concrete at an average price of $19.95 per cubic yard. Its average total costs for the period, however, were $22.39 per cubic yard. Losses during its 22 months of operation were such that on July 27, 1974, Richter publicly announced its closing.

On August 1, 1974, New Richter entered into an agreement with Reading Central Mixed Concrete, Inc., for the sale of substantially all its assets other than mixer trucks involved in the sale of ready-mix concrete in the Cincinnati area. The total purchase price was $325,000 plus $48,865.34 for raw materials on hand. The net payment to New Richter by Reading, after proration of taxes and expenses, was $370,719.59.

Plaintiff's evidence thus established that during much of the relevant period, Hilltop priced its concrete below levels sufficient to recover its average total costs. Plaintiff seeks to characterize Hilltop's prices as predatory, and alleges further that Marquette encouraged such predatory pricing by entering into the 1964 agreement. Plaintiff's contention is that defendants' actions caused it to either lose contracts to Hilltop or to take contracts at a loss, and, eventually, go out of business. Accordingly, plaintiff seeks to recover the alleged damages from defendants.

### III.

■■ The gravamen of an attempt to monopolize is that a defendant must have

both the power[2] and the specific intent to monopolize.[3] To prove an attempt to monopolize, plaintiff must show:

(1) That Hilltop had the specific intent to monopolize or to destroy competition within the relevant market;

(2) That Hilltop engaged in some predatory or anticompetitive conduct in furtherance of that intent;

(3) That Hilltop's conduct created a dangerous probability that monopolization could occur; and

(4) That Hilltop's conduct proximately caused plaintiff some antitrust injury. *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 736 (9th Cir. 1979); *see also Chillicothe Sand & Gravel v. Martin-Marietta Corp.,* 615 F.2d 427, 430 (7th Cir. 1980); *Gough v. Rossmoor Corp.,* 585 F.2d 381, 390 (9th Cir.), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); and *American Tobacco Co. v. United States, supra,* n. 1, 328 U.S. at 785, 66 S.Ct. at 1127.

Plaintiff has no direct evidence that Hilltop specifically intended to monopolize the Greater Cincinnati ready-mix concrete market. Instead, plaintiff relies on proof of Hilltop's alleged predatory pricing to form a basis for the inference that Hilltop harbored such intent. We focus our initial inquiry, then, on whether plaintiff introduced sufficient evidence for a jury to reasonably conclude that Hilltop engaged in predatory pricing. As will be seen, however, this inquiry will necessarily involve considerations of Hilltop's intent.

Before considering plaintiff's evidence, some definition of predatory pricing is required. Predation, according to Webster, is "the act of preying or plundering." Webster's Third New International Dictionary, 1967 Ed. It is "depredation, despoilment," or "rapacity." *Id.* As a pricing

practice, predation consists of the deliberate sacrifice of current revenues for the purpose of driving rivals out of the market with the hope of recouping the losses through higher profits earned in the absence of competition. *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 723 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 698 (1975). This definition gives a fair sense of the concept of predatory pricing and is one on which the parties can agree—it is pricing derived, not from considerations of achieving profitability within the framework of competition, but from considerations of eliminating competition in order to achieve profitability.

This definition does not, however, provide any useful guidelines for distinguishing the one form of pricing, which is a healthy reflection of competition and to be encouraged, from the other, which is predatory, anti-social and unlawful. While predation may be "depredation, despoilment" or "rapacity," competition at its most vigorous level looks like all of these things. Yet its preservation, preferably at this most vigorous level, is the very thing the antitrust laws are intended to accomplish. *See Janich Bros. v. American Distilling Co.,* 570 F.2d 848, 855 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *International Air Industries, supra,* 517 F.2d at 721; and *Anheuser-Busch, Inc. v. FTC,* 289 F.2d 835, 840 (7th Cir. 1961). "If the law is overzealous in guarding against predatory pricing, it may well inhibit the competitive dynamics it seeks to promote." *In re IBM Peripheral EDP Devices,*

---

**2.** *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Mowery v. Standard Oil of Ohio,* 463 F.Supp. 762, 772 (N.D.Ohio, 1976) *affirmed* 590 F.2d 335 (6th Cir. 1978).

**3.** *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Times-Picayune v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Mowery, supra,* N. 1, 463 F.Supp. at 772.

481 F.Supp. 965, 991 (N.D.Cal.1977). Great care must be taken, if the proper ends of the antitrust laws are to be served, in differentiating between legitimate price competition and that predatory pricing which constitutes an unlawful attempt to monopolize. The parties are at fundamental odds as to how this should be done.

Plaintiff urges the Court to adopt a flexible approach by considering Hilltop's prices, not only in relation to cost, but also in relation to "other circumstances." Plaintiff demonstrated that Hilltop's average prices were below its average total costs for the period; yet the parties have stipulated that Hilltop's prices were above its average variable costs. Plaintiff concedes that just because a firm fails to recover its average total costs, i.e., just because a firm is losing money, no presumption of predation should arise. But plaintiff argues that when below-cost prices are coupled with certain "other circumstances," one may reasonably draw an inference of predation. Plaintiff is unable to enlighten the Court as a matter of law as to what these "other circumstances" may be. Plaintiff only argues that in the present case, the existence of the loss-makeup provisions in the 1964 Hilltop-Marquette agreement, and the likelihood that a normal businessman would take these provisions into account when deciding whether his firm would be better off selling its product at a loss than not selling at all, constitute such "other circumstances" which, when coupled with Hilltop's below-cost prices, are sufficient to raise an inference of predation.

Defendants, on the other hand, press for the adoption of a more rigid rule, and are quite definite about what that rule should be: prices above marginal or average variable cost should be conclusively presumed non-predatory; prices below marginal or average variable cost should be conclusively presumed predatory. Adoption of this rule would make this case quite simple, for, if this is indeed the law, the parties have stipulated that Hilltop has not engaged in predatory pricing.

The principal authorities in support of defendants' position are Professors Areeda and Turner. Areeda and Turner, using a strictly cost-based standard for predatory pricing, maintain that prices above marginal cost should be conclusively presumed non-predatory. Areeda and Turner, *supra,* 88 Harv.L.Rev. at 733. A price floor above this level, they argue, will result in inefficient resource allocation and reduce incentives to legitimately compete. *Id.* at 709–12. But the firm which prices below marginal cost "is not only incurring private losses but wasting social resources when marginal costs exceed the value of what is produced." *Id.* at 712. "And pricing below marginal cost greatly increases the possibility that rivalry will be extinguished or prevented for reasons unrelated to the efficiency of the monopolist." *Id.* Accordingly, they maintain that prices below marginal cost should be conclusively presumed predatory. *Id.* Since marginal cost is difficult to ascertain, Areeda and Turner suggest the use of average variable cost as a surrogate for marginal cost, *Id.* at 716–718, and conclude that "[a] price at or above reasonably anticipated average variable cost should be conclusively presumed lawful," while "[a] price below reasonably anticipated average variable cost should be conclusively presumed unlawful." *Id.* at 733.

Several courts, relying heavily on Areeda and Turner, have adopted the marginal or average variable cost standard for predatory pricing. *See Hanson v. Shell, supra,* 541 F.2d at 1359 ("Hanson's failure to show that Shell's prices were below its marginal or average variable costs was a failure as a matter of law to present a prima facie case under § 2"); *International Air Industries, supra,* 517 F.2d at 724 ("[I]n order to prevail as a matter of law, a plaintiff must at least show that ... a competitor is charging a price below his average variable cost in the competitive market ...");[4] *Janich Bros.,*

---

4. The Court in *International Air Industries* also set forth an alternative test, that if the defendant's prices are not below its average variable costs, then they must be "below its short-run, profit maximizing price and barriers to entry ... great enough to enable the discriminator to

*supra,* 570 F.2d at 858–59 ("Janich has not come forth with sufficient evidence to go to the jury on a contention that American sold gin and vodka below average variable costs for the period 1961–62 ... Consequently, insofar as the attempt to monopolize claim was founded on predatory pricing, a directed verdict against Janich was proper."); *Weber v. Wynne,* 431 F.Supp. 1048, 1059 (D.N.J.1977) ("I follow the [*International Air Industries* v.] *American Excelsior* and the Areeda and Turner analysis and find that any price which is at or above average variable cost may be competitive but is not predatory.")

The Areeda and Turner thesis, however, has not been universally accepted. Those who reject it do so principally because of Areeda and Turner's dogged insistence upon use of a standard which optimizes short-run welfare in spite of their own recognition that such a standard in the long run may have adverse, anticompetitive effects. Professor Scherer, for example, argues that "it is unrealistic and even analytically wrong to apply a simple short-run price-cost rule for determining whether exclusionary pricing by a monopolist is socially undesirable and therefore predatory." Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869 (1976). He proposes instead a "rule-of-reason" analysis, taking into account the variety of factors affecting long-run welfare [5] in light of the pricing firm's intent and the actual structural consequences to the industry flowing from the pricing firm's conduct. *Id.* at 890. Professor Williamson likewise feels that negligible benefits would flow

from allowing the monopolist to exclude competition by pricing at marginal cost only to restrict output and raise prices once competition has been eliminated. Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284, 340 (1977). As an alternative to Areeda and Turner's marginal-cost rule, Williamson proposes a complex set of rules, a different one to be applied according to whether a monopolist is pricing in reaction to established or new entries, whether its pricing policies extend over the short, long or intermediate run, and whether the monopolist faces a normal demand curve or is operating in a market plagued by conditions of chronic excess supply. *Id.* at 331–37. A third author, Professor Schmalensee, joins Professors Scherer and Williamson in rejecting Areeda and Turner's marginal cost test as one of universal applicability. Schmalensee, *On the Use of Economic Models in Antitrust: The Realemon Case,* 127 U.Pa.L.Rev. 994, 1128 (1979). But, attempting to apply Williamson's *per se* rules to the real-life facts of the *Realemon* case,[6] Schmalensee found them difficult to apply and apparently based on an economic model not in conformity with real-life conditions. *Id.* at 124–28. From this he concludes that the only economically defensible policy approach to predatory pricing is Scherer's proposal that a "rule of reason" be followed, perhaps tempered by Bork's admonition[7] that a strong presumption be made against the existence of predation. *Id.* at 1028–31.

Besides generating academic discussion, Areeda and Turner's standard for predatory pricing has met with varied acceptance by

---

reap the benefits of predation before new entry is possible." 517 F.2d at 724. We conclude this alternative test is inapplicable to the present case, because plaintiff has introduced no evidence as to Hilltop's short-run profit maximizing price, and what evidence was presented concerning barriers to entry into the ready-mix concrete industry suggests that they are relatively low. This leaves, according to the *International Air Industries* Court, only Areeda and Turner's average variable cost test for predatory pricing.

5. These factors include the relative cost structures of the alleged predator and victim, wheth-

er the alleged predator expands output to replace that of excluded rivals or whether it restricts output to raise prices once rivals withdraw, and whether long-run compensatory expansion by the alleged predator includes investment in new facilities promoting economies of scale.

6. *Borden, Inc.,* 1978 Trade Reg.Rep., Case No. 21,490 (FTC 1978).

7. R. Bork, The Antitrust Paradox, 144–155 (1978).

the courts. At least two Circuit Courts of Appeals have considered Areeda and Turner's marginal or average variable cost test, have found it to be very useful as an analytical tool, but have declined to assign it any more importance than that. *See Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.,* 551 F.2d 790, 797 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160, *rehearing denied,* 434 U.S. 977, 98 S.Ct. 543, 54 L.Ed.2d 472 (1977); and *Chillicothe Sand & Gravel v. Martin Marietta Corp.,* 615 F.2d 427, 432 (7th Cir. 1980). Both Courts recognized the relevance and importance of marginal or average variable tests to determining the presence of predatory pricing, but neither refused to consider the presence of "other factors" in evaluating whether a plaintiff had established a prima facie case under Section 2. 551 F.2d at 797; 615 F.2d at 432. In this, they too would seem to follow Scherer's "rule of reason" analysis.

In rebuttal to these criticisms, Areeda and Turner defend their proposition:

First, predatory pricing rules must take into account the proclivity of competitors to challenge a rival's price cuts, particularly when the rival is a larger firm. The threat of litigation may therefore deter legitimate competitive pricing. Second, pricing at SRMC [short run marginal cost] is the result in competitive markets, and has the social welfare virtue of avoiding wasteful idling of current productive resources. Third, rules requiring price floors higher than SRMC will tend to preserve inefficient rivals or attract inefficient entry. Fourth, elimination or exclusion of rivals may in some instances cause long-run welfare losses that exceed the short-run gains from fuller use of capacity, but such long-run consequences cannot feasibly be incorporated into legal rules because they are intrinsically speculative and indeterminate.

Areeda and Turner, *Williamson on Predatory Pricing,* 87 Yale L.J. 1337, 1339 (1978).

In an opinion which we find highly persuasive and which we largely adopt, the District Court for the Northern District of California [8] offered the following criticisms of Areeda and Turner's justifications for use of the marginal or average variable cost rule. First, the Court wrote, adoption of a marginal or average variable cost test because it may deter frivolous suits "smacks of overkill." 481 F.Supp. at 992. Although a rule preserving competitive incentives is necessary, a rule sanctioning all price levels above average total cost would adequately serve this purpose. *See Schmalensee, supra,* 127 U.Pa.L.Rev. at 1029. It would not, however, share the marginal or average variable cost rule's vice of allowing a monopolist, for the sake of preserving incentives, to unreasonably destroy its competition. 481 F.Supp. at 992.

Second, the rationale that a price floor above marginal cost will tend to preserve inefficient rivals is "interesting, but highly questionable." *Id.* at 993. Even conceding some value to a rule apparently delegating responsibility to the monopolist for rooting out and destroying economic inefficiency, Areeda and Turner, and those courts adopting their rule, overlook the tendency of the marginal or average variable cost rule to destroy equally and even more efficient rivals, unless they have pockets as deep as the monopolist's. *Id.* at 991–93.

To [state] what is self-evident, if a firm sells below its average cost it is incurring a loss, equally efficient firms are incurring a loss, and more efficient firms (if their average cost is lower than the monopolist's average cost but greater than the price) will also be incurring a loss. Only firms able to withstand losses for as long as the monopolist decides to inflict them will survive, others will perish.

*Id.* at 992. Thus, the Areeda and Turner rule inherently bears the potential mischief of transforming competition from a battle of efficiency into a battle of bankrolls. Scherer's "rule of reason" would not share this vice.

If the principal criticism of Areeda and Turner's short-run welfare maximization

**8.** In *In re IBM Peripheral EDP Devices, Inc.,* 481 F.Supp. 965, 992–95 (1979).

argument is that it is short-sighted, *Id.* at 993, Scherer, *supra,* 89 Harv.L.Rev. at 883–900, Williamson, *supra,* 87 Yale L.J. at 291, their ultimate defense of the rule seems to be that any other would be unmanageable. Even Areeda and Turner recognize that "the net long-run consequences of [marginal cost] pricing might be adverse because of its effect on existing or potential rivals." Areeda and Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv.L.Rev. 868, 896–97 (1976). Nevertheless, they conclude that "long-run possibilities must be disregarded because they are intrinsically speculative and indeterminate." *Id.* at 897. Furthermore, "[n]o suitable administrable rules could be formulated to give them recognition." *Id.* But as the Court in *In Re IBM* pointed out, "ease of application is a poor argument for adopting a rule that admittedly ignores important considerations of economic efficiency, especially when the main justification for that rule is economic efficiency." 481 F.Supp. at 993. "Section 2 of the Sherman Act makes no exception for cases involving administrative difficulty." *Chillicothe Sand and Gravel, supra,* 615 F.2d at 432.

But even granting ease of application paramount consideration, Areeda and Turner's marginal cost test can fare no better than the others. Marginal cost is essentially a fictional figure, not readily ascertainable from any corporate book of account—hence the need for average variable cost as a surrogate. In short,

> [Areeda and Turner] argue that a marginal cost test will optimize social welfare. Then they admit that it will not. They argue that a marginal cost test is easier to apply than a long-run welfare maximizing test, then they suggest surrogates because marginal cost data is impossible to come by.

*　*　*　*　*　*

Areeda and Turner have made a policy judgment. The economic analysis used to justify that judgment is incomplete, and the judgment itself stands contradicted by the economic, political, and social policies of the Sherman Act.

A conclusive presumption of the legality of an unprofitably low price, merely because it is above marginal cost, would truly be a "defendant's paradise."

*In Re IBM,* 481 F.Supp. at 994–95. We join Professors Scherer, Williamson and Schmalensee, and the *IBM* Court in rejecting Areeda and Turner's use of marginal or average variable cost as an absolute or *per se* rule for predatory pricing.

■ Although we reject the use of marginal cost as a *per se* rule, we do not deny its relevance in determining the presence of predatory pricing. When a firm prices below its total cost, something is afoot; assuming the firm is acting somewhat rationally and is not simply suffering from gross mismanagement, there is a reason why the firm is losing money. The reason may be legitimate. The firm may be liquidating excess, perishable or obsolete merchandise. It may be minimizing its losses by selling at the best price-cost relationship available within a market beset by shrinking demand, or chronic excess capacity. It may be a fledgling firm not yet recouping high start-up costs, or it may be engaging in promotional pricing when launching a new product line. It may be simply struggling to maintain its market share by meeting competitors' lower prices. It may even, under proper circumstances, be engaging in a temporary price war. *See In Re IBM,* 481 F.Supp. at 996 *and authorities cited therein.* A host of legitimate business reasons can exist to explain why a firm might choose to price, temporarily, below its total costs. But there are illegitimate reasons as well. The firm may be motivated by nothing more than a desire to starve out competition. The relation of a firm's prices to its costs may be the same in either instance. What differs is the reason for that relation—whether the firm is pricing below cost in response to legitimate business concerns or as part of a long-run strategy to destroy competition. This is really the question of intent. Determining the relation of a firm's prices to the various components of its costs is most helpful, not because it tells us absolutely whether predation has oc-

curred, but because it tells us whether it is useful to go beyond the price-cost relationship to explore the underlying reasons for it, or, in other words, whether we should examine the pricing firm's intent.

In sum, we think the proper rule regarding predatory pricing is this: a firm that prices its product above average total cost is not engaged in predatory pricing; a firm that prices its product below marginal or average variable cost presumptively is. A firm that prices its product above marginal or average variable cost but below average total cost may or may not be engaged in predatory pricing, and proof that it is must come from independent evidence that such pricing is "unreasonable," or intended to destroy competition.[9] This independent evidence may be direct (plaintiff may discover, for example, a "smoking gun" memorandum, outlining a defendant's plan of monopolization), or indirect, created by inference where a defendant's below-cost prices cannot be justified by legitimate business concerns. But given the many innocent reasons for which below-cost pricing can occur, the necessary intent which permits us to characterize below-cost pricing as predatory cannot be inferred from the fact of below-cost pricing alone. In order to establish a prima facie case under Section 2 when a defendant's below-cost prices are above its marginal or average variable cost, a plaintiff must come forth with some independent evidence of defendant's specific intent to monopolize.

Plaintiff has come forth with no such independent evidence, and for this reason its attempt to monopolize claim under Section 2 must fail. Plaintiff has no direct evidence that Hilltop intended to monopolize the Greater Cincinnati ready-mix concrete market. Plaintiff hopes instead to create an inference of Hilltop's specific intent to monopolize through characterizing its prices as predatory. But Hilltop's prices, being above its average variable costs, were not in themselves predatory, and the separate evidence plaintiff has produced concerning Hilltop's intent falls far short of demonstrating or creating an inference of predation.

Plaintiff's separate evidence of Hilltop's intent consists principally of its comparison between Hilltop's and Richter's price-cost structures, and its argument that it was unnecessary, given these structures, for Hilltop to price below its costs in order to meet the competition from Richter. Plaintiff's expert testified that although both Hilltop and Richter priced below their respective average total costs during the relevant period, Richter's average price of $19.95 per cubic yard was above Hilltop's average total cost of $19.88 per cubic yard. Thus, according to plaintiff's expert, it would not have been necessary for Hilltop to sustain the losses it did in order to meet the competition from Richter. Hilltop could still have met, the argument goes, Richter's average selling price and turned a profit.

**9.** *See In re IBM, supra,* 481 F.Supp. at 996, ("Intent evidence can prove helpful here. The monopolist's own evaluation of the situation, whether it thought it was cutting losses or cutting throats, can help to clarify the nature of the acts undertaken."); Scherer, *supra,* 89 Harv.L.Rev. at 890 (I do not know how these variables can be assessed properly without a thorough examination of . . . how the monopolist's officials perceived the probable effects of its behavior (i.e., intent) . . ."); R. Posner, *Antitrust Law* 4, at 190 (1976) ("Proof of sales below average balance sheet cost with intent to exclude might be enough to establish a prima facie case of predatory pricing."); *Report to the President and the Attorney General of The National Commission for The Review of Antitrust Laws and Procedures,* Antitrust and Trade Reg.Rep. (BNA), No. 897, Spec.Supp. at 44, (Jan. 18, 1979) ("[W]here there is other evidence of exclusionary or predatory intent, the fact that prices were above marginal cost should not absolutely bar a finding of liability. Rather, the relation of price to marginal cost should be considered in its context along with the separate evidence of intent and the defendant's market power."); and Greer, *Critique of Areeda and Turner's Standard for Predatory Practices,* 24 The Antitrust Bulletin 233, at 242 (Summer, 1979) ("Evidence of intent is needed because pricing below full cost can occur for innocent reasons other than predation. Intent establishes the presence of a long-run predatory strategy at work rather than a short-run expedient.").

Next, plaintiff points to the loan guarantee and loss-makeup provisions of the 1964 agreement to establish Hilltop's superior financial staying power, which every predator must have in order to successfully starve out competition. Secure in the knowledge that whatever its real losses were, net losses would be only one-half that amount, Hilltop was able to price below the level it could have absent the 1964 agreement. The 1964 agreement thus served as a stimulus to and a cushion for engaging in predatory pricing.

Plaintiff contends that Hilltop's supposed lack of need for below-cost pricing, and financial ability beyond that of competitors to engage in below-cost pricing, plus the actual below-cost pricing constitute sufficient evidence to support an inference of Hilltop's predatory intent.

Plaintiff's argument would have merit if Richter and Hilltop were the only competitors in the marketplace. Certainly, had that been the case it would not have been necessary for Hilltop to lose, as it did, an average of $1.08 per cubic yard of concrete sold just to meet the competition from Richter. If Richter had been Hilltop's only competitor, Hilltop could have raised its prices substantially, beaten Richter's average price, retained its market share, and perhaps even turned a profit.

Plaintiff totally ignores, however, that some 25 firms competed for business during the relevant period, and that several of them, including Reading, Moraine, Tri-County and Plainville, were operations of substantial size, garnering significant market shares. Combined, these four firms accounted for approximately 62% of all ready-mix concrete sales by firms other than Hilltop during the relevant period. (See P. Exh. 1143.) Clearly, given the substantial role these other firms played in the market, Hilltop was not free to price in utter disregard of their prices, and its conduct cannot be judged without reference to their conduct. "A company should not be guilty of predatory pricing, regardless of its costs, when it reduces prices to meet lower prices already being charged by its competi-

tors." *ILC Peripherals v. International Business Machines*, 458 F.Supp. 423, 433 (N.D.Cal.1978). If Hilltop's prices were in line with competition generally, and if competitors operated profitably at prevailing prices, then it is meaningless to say that Hilltop did not have to price so low to meet the competition from Richter. Hilltop cannot reasonably be required by the antitrust laws to raise its prices to non-competitive levels. Not even a monopolist is required to cut his own throat. *See Dehydrating Process Co. v. A. O. Smith Corp.*, 292 F.2d 653, 657 (1st Cir. 1961). Hilltop's prices cannot be considered unreasonable without considering how they affected and were affected by competitors' prices. The influence these other firms had on competition generally and on Hilltop's prices specifically, and the role they might have played in contributing to plaintiff's demise, cannot be ignored.

Plaintiff, however, has created an unreal picture of the marketplace by effectively excising from its proof all evidence concerning these other competitors. In this respect plaintiff has focused, not on Hilltop's effect on competition, but on the supposed effect on a single competitor, a focus not countenanced by the antitrust laws. "Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise." *Atlas Building Products v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). By failing to introduce any evidence concerning competition generally, how other firms' costs and prices compared with Hilltop's, or how these other firms affected and were affected by Hilltop's prices, plaintiff has deprived the trier of fact of an evidentiary basis for reasonably concluding that Hilltop engaged in predatory pricing intended to destroy competition. Hilltop and Richter did not do business in a vacuum; plaintiff cannot prove its case as though they did.

What evidence exists concerning competition generally and the pricing behavior of

other firms has come principally through defendants' cross-examination of plaintiff's witnesses (several of whom were officers of Hilltop). With this evidence, we can at least partially remove Hilltop and Richter from the "vacuum chamber" of plaintiff's proof and view them side by side in competition with the other firms in the market. In so viewing them, the last vestige of credibility vanishes from plaintiff's contention that Hilltop was unilaterally slashing prices and could have raised them to profitable levels without fear of losing business.

■ Competitive price information is known regarding 55 specific jobs for which Hilltop bid competitively with other companies (see Appendix). Hilltop was low bidder on 14 of these jobs and was the successful bidder on only 10. Richter was low bidder on 21 of these jobs and was the successful bidder on 19. Other companies submitted low bids on 24 of these jobs and bid successfully on 26.[10] Altogether, for the 41 jobs for which Hilltop was not low bidder, 55 companies submitted bids equal to or lower than Hilltop's. The success other companies had in bidding against Hilltop belies plaintiff's claim that Hilltop predatorily slashed prices without any legitimate business justification.

The evidence concerning average price quotations among the major competing firms also contradicts plaintiff's claim. It shows that Hilltop's average price quotations were never consistently below those of the major competitors. Hilltop's quarterly average price quotations were below Moraine's in only three of the seven quarters comprising the relevant period,[11] and below

Reading's in only four.[12] The average price quotations were below Plainville's in five of the seven quarters,[13] and below Richter's in six.[14] Hilltop's price quotations were the lowest among these five companies in only two of the seven quarters.[15] This is evidence, not of predation, but of thriving competition.

Finally, Hilltop's officers uniformly testified that price-setting objectives were always to reap the highest possible returns while still remaining price-competitive. Costs were always considered, and the company never intentionally took a job knowing it would lose money. Although we can expect this testimony to be self-serving, it is not contradicted, and is strongly corroborated by the evidence of Hilltop's direct costs incurred on the very jobs selected by plaintiff to demonstrate Hilltop's predation (D. Exh. 581), and by Hilltop's monthly sales reports (replete with suggestions for controlling costs), references to competitors' frequently lower prices, and intimations of Hilltop's averred policy of following rather than leading price trends.

With competitors quoting prices generally very close to and frequently below Hilltop's, the assumption that Hilltop could have avoided its losses by raising its average prices by $1.08 per cubic yard is wholly unreasonable. Basic economic theory holds that when a firm raises its prices relative to those of competitors, it loses business to competitors. The truth of this theory is demonstrated by the loss of business Hilltop suffered after initiating the 1½% late payment charge (which it had to drop after only two months), the March 1, 1974 price

10. The total number of low bids (59) exceeds the total number of jobs (55) because in some cases the companies submitted identical low bids.

11. Hilltop's average price quotations were below Moraine's in the 4th quarter of 1972, and the 1st and 2nd quarters of 1973. (D.Exh. 576.)

12. Hilltop's average price quotations were below Reading's in the 4th quarter of 1972, the 2nd and 3rd quarters of 1973, and the last "quarter" of the relevant period, from April to July, 1974. (D.Exh. 576.)

13. Hilltop's average price quotations were below Plainville's in the 4th quarter of 1972, the 2nd, 3rd and 4th quarters of 1973, and the period from April to July, 1974. (D.Exh. 576.)

14. Hilltop's average price quotations were below Richter's in every quarter of the relevant period except from the period from April to July, 1974. (D.Exh. 576.)

15. Hilltop's average price quotations were the lowest among the five companies in the 4th quarter of 1972 and in the 2nd quarter of 1973. (D.Exh. 576.)

increase (after which it lost over 20 major jobs in a row), and the Fall, 1974 full-load policy (which caused several customers to buy concrete from other suppliers). In each case, as Hilltop's prices rose relative to competitors, its business volume suffered. And even though it was supposedly charging such low prices, its percentage market share declined considerably over the course of the relevant period, from approximately 40% to approximately 30% of the total. Under these circumstances, it is unreasonable to assume that Hilltop was pricing below cost in order to drive out competition, and that it could have raised prices above costs and retained the same volume of business. The only reasonable conclusion to be drawn from all the evidence is that Hilltop was legitimately responding to the pressures of a healthy and vigorously competitive industry.

Beyond the discredited claim that Hilltop did not have to price as low to meet the competition from Richter, plaintiff has only the 1964 agreement and the resulting financial strength afforded Hilltop to support the allegation of predatory pricing. From Hilltop's undeniably superior financial ability to withstand losses, an ability derived in part from the loss-makeup provision of the 1964 agreement, plaintiff seeks to draw the inference that Hilltop abused its financial strength in order to drive the competition out of business.

■ The inference plaintiff seeks to draw, however, is in this case a patent *non sequitur*. Obviously, any firm will consider its financial resources when confronting a possible financial loss. If the firm does not have the strength to sustain the loss, it will not; if it has, it will at least have the choice of whether to do so. We can further assume that a firm will not engage in predatory pricing unless it believes it has the resources to outlast the competition. But the fact that a firm may be financially able to sustain a loss tells us nothing about why it might be forced, or may voluntarily choose, to do so. It does not reasonably follow, without some other evidence of predatory intent, that simply because Hill-

top was better able to sustain business losses than Richter, that Hilltop purposely did so in order to drive Richter out of business. Moreover, there is no other evidence of predatory intent.

■ In sum, in order to present a prima facie case of predatory pricing under Section 2, plaintiff must show either that Hilltop priced below cost with the intention of driving out the competition, or that it priced below cost without any legitimate business justifications for doing so. Plaintiff has no direct evidence of Hilltop's intent, and all the evidence from which Hilltop's intent may be inferred shows that Hilltop was legitimately pricing in response to the frequently lower prices of competitors. There is no evidence from which it could reasonably be inferred that Hilltop was engaged in predatory pricing, and for this reason, plaintiff's Section 2 claim against Hilltop must fail.

## IV.

Even if plaintiff had come forth with sufficient evidence to support a reasonable conclusion that Hilltop engaged in predatory pricing, the Court would have directed a verdict against plaintiff on its attempt-to-monopolize claim because it is clear that Hilltop's conduct, no matter how characterized, created no "dangerous probability" that monopolization would occur.

■ Section 2's prohibition against attempts to monopolize against attempts to monopolize reaches acts which fall short of obtaining monopoly power and thus would be insufficient to support a charge of monopolization. *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946). It is not necessary for an attempt to have actually been successful in order to constitute a violation of Section 2. *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *Alles v. Senco Products, Inc.*, 329 F.2d 567, 571 (6th Cir. 1964). However, since Justice Holmes enu-

merated, in *Swift & Co. v. United States,*[16] the three [17] elements of the attempt offense—specific intent, overt acts and dangerous probability of monopolization—the vast majority of courts have required a plaintiff to prove that the defendant possesses sufficient market power to create a "dangerous probability" that monopolization would occur from the conduct in question. *See, e.g., American Tobacco Co., supra,* 328 U.S. at 785, 66 S.Ct. at 1127; *California Computer Products v. International Business Machines,* 613 F.2d 727, 736–37 (9th Cir. 1979); *H. & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 242 (5th Cir. 1978); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1030 (2nd Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir. 1975); *E. J. Delancy Corp. v. Bonne Bell, Inc.,* 525 F.2d 296, 305 (10th Cir. 1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976); *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 284 (8th Cir.), *cert. denied,* 414 U.S. 1022, 1032, 94 S.Ct. 445, 461, 38 L.Ed.2d 313, 323 (1973); *Mowery v. Standard Oil of Ohio,* 463 F.Supp. 762, 772 (N.D.Ohio 1976). We follow these decisions in holding a dangerous probability of success is an essential element of plaintiff's burden of proof.

 In considering whether such dangerous probability exists, it is necessary to define the relevant product and geographic market, for only in terms of such markets can a defendant's exclusionary power or ability to lessen or destroy competition be appraised. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). Although defendants intended to dispute plaintiff's definition of the relevant market, there is sufficient evidence to conclude that the relevant markets are what plaintiff claims, i.e., the market for ready-mix concrete in the seven-county area comprising Greater Cincinnati. The

sole question, then, is whether Hilltop had sufficient power within these markets that its conduct created a dangerous probability of monopolization. The inescapable conclusion is that it did not.

 . The principal indicia of monopoly is the holding of monopoly power. Monopoly power is the "power to control prices or exclude competition." *United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Hilltop lacked the power to do either.

The evidence concerning Hilltop's pricing conduct and the influence other competitors had in the marketplace has been set forth at length above in Section III and below in the Appendix to this Opinion. That evidence shows that Hilltop followed the downward price trend and that Hilltop's unilateral attempts to raise prices uniformly provoked shifts in business to competitors. Clearly, prevailing market prices involved factors beyond Hilltop's control.

Hilltop's power to exclude competition was no greater than its power to control prices. The number of competitors in the market was fairly high, and barriers to entry were relatively low. Just over $370,000 was required to purchase substantially all the assets other than the mixer truck leases of one of the largest companies in the business (Reading purchased Richter in July, 1974 for $370,719.59). On the opposite end of the spectrum, Hilltop's monthly sales report for February, 1974 provides a clue as to how low these barriers were:

There are two new potential competitors in the No. Kentucky area. Buck Shinkel, formerly a salesman for Tri County, has started a two truck operation with the Walton Lumber Co. in Walton, Kentucky. They have on the site at this time an old tipple and scales and have added a small cement silo. The trucks are two 7 cu. yd. units and the information we have is that Buck and his son will weigh out and drive

---

**16.** 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905).

**17.** The fourth element we listed earlier, causation, is really a requirement of standing and not an element of the offense itself.

the units. We also understand that Bob Bell, formerly of Bell Foundations, has purchased a small ready mixed plant from A. J. Lubrecht on Hebron-Limaburg Road in Burlington, Kentucky. We have observed one International mixer at the plant and understand there are 3 other used mixers available to Bell. The equipment at this site was purchased two or three years ago by A. J. Lubrecht at an auction sale in Louisville.

(P. Exh. 69.) With such low barriers to entry, several new companies entered the market during the relevant period, including a number of low-cost, non-union operations which arose during the two-month mixer truck drivers' strike and flourished. It is also significant that the productive facilities of failed firms did not fall into disuse. In most cases, they were purchased and operated either by firms new to the area, as when Collinwood took over Old Richter in 1972, or by existing competitors, as when Reading took over New Richter in July, 1974, and L&N took over Michaels and Tri-County. (See P. Exhs. 77, 78.) Under such circumstances, Hilltop's power to exclude competition could be temporary at best.

Having neither the meaningful power to control prices nor to exclude competition, Hilltop had no monopoly power. From this fact we must conclude that Hilltop's conduct created no dangerous probability such power would be acquired, for Hilltop's percentage market share declined over the relevant period. It is difficult to conceive of a firm without monopoly power thereafter acquiring such power through a decline in percentage market share. The only reasonable conclusion in this case is that Hilltop did not have monopoly power and was getting farther and farther from achieving it. As such, the evidence fails to support the conclusion that Hilltop's conduct created a dangerous probability that monopolization would occur. For this reason also the Court directed a verdict against plaintiff on its claim of attempted monopolization.

## V.

The second thrust of plaintiff's Section 2 claim is that Hilltop and Marquette conspired together to create a monopoly for Hilltop in the Greater Cincinnati ready-mix concrete market. However, there is no substantial evidence from which the jury could reasonably conclude that a conspiracy existed or that defendants entered into any agreement with the specific intent to monopolize. Accordingly, the Court directed a verdict against the plaintiff on its Section 2 claim of conspiracy to monopolize.

Section 2 of the Sherman Act makes it unlawful to "combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations." 15 U.S.C. § 2. The offense of combination or conspiracy to monopolize may be defined as concerted action among two or more independent entities undertaken with the specific intent to monopolize. Kintner II, Federal Antitrust Law § 14.1, 432 (1980). In this context, the terms "combine" and "conspire" are used interchangeably by the courts and refer to the same offense. *See, e.g., United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Sulmeyer v. Coca-Cola Co.,* 515 F.2d 835, 851 (5th Cir.), *rehearing denied,* 520 F.2d 943 (1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *Mt. Lebanon Motors, Inc. v. Chrysler Corp.,* 283 F.Supp. 453, 462 (W.D.Pa.1968).

Although the offenses of attempt to monopolize and conspiracy to monopolize are related to some extent and bear certain common elements, important differences exist between them. Thus, both offenses require proof of a specific intent to monopolize. *Salco Corp. v. General Motors Corp.,* 517 F.2d 567 (10th Cir., 1975); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir. 1961). The attempt offense, however, may be committed by a single defendant, and further requires proof that some overt act on the part of the defendant created a dangerous probability of monopolization. *See* Sections III and IV

above, and Kintner, *supra* § 14.1, at 433. This necessarily involves considerations of the relevant markets and the defendant's market power. In contrast, Section 2's prohibition against conspiracies is directed solely at concerted action among independent entities acting with the specific intent to monopolize. Kintner, *supra,* § 14.1 at 433. Section 2 condemns conspiracies to monopolize whether "wholly nascent or abortive on the one hand, or successful on the other." *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 225–226 n. 59, 60 S.Ct. 811, 846 n. 59, 84 L.Ed. 1129 (1940) (Section 1 conspiracy); *Bowen v. New York News, Inc.,* 366 F.Supp. 651, 676 (S.D.N.Y.1973), *affirmed in part and reversed in part,* 522 F.2d 1242 (1976), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976) (Section 2 conspiracy). For this reason it is not necessary to consider the relevant markets, defendants' market power, and the probability of achieving monopolization in Section 2 conspiracy cases. *See United States v. Yellow Cab Co.,* 332 U.S. at 225–226, 67 S.Ct. at 1564; *United States v. Consolidated Laundries Corp.,* 291 F.2d at 573; and Kintner, *supra,* § 14.6 at 438–441.

Specifically, to establish the existence of a conspiracy to monopolize in violation of Section 2, plaintiff must prove the following elements: (1) the existence of a conspiracy; (2) some overt act in furtherance of the conspiracy; (3) an effect upon an appreciable part of interstate commerce; and (4) the existence of the specific intent to monopolize. *Cullum Electric & Mechanical, Inc. v. Mechanical Contractors of South Carolina,* 436 F.Supp. 418, 425 (D.S.C.1976), *affirmed,* 569 F.2d 821 (5th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978). Although the necessity of proving overt action is questionable,[18] we need

not consider the problem because there is no evidence that a conspiracy or agreement existed between the defendants that was intended to drive Richter or other competitors out of business.

The only agreement between the defendants of which there is any evidence at all is the 1964 agreement. If a conspiracy existed, its inception is there.

As to the nature and intent of the 1964 agreement, the defendants' position is unassailable. Old Richter was the largest ready-mix concrete producer in the area in 1964, and had just concluded a vertical integration agreement with the River Fuel Corp., a major producer of cement. In response to the Richter-River Fuel Corp. combination, Hilltop and Marquette entered into the 1964 agreement. Far from manifesting any intent to drive Richter or any other company out of business, the agreement, as stated in the preamble, appears designed to solidify defendants' respective market positions against the Richter-River Fuel Corp. combination and to prevent that combination from driving them out of business in the Cincinnati area. This expression of defendants' intentions is wholly corroborated by the testimony of Messrs. Harrington and Steele, and by the fact that neither defendant is alleged to have committed any act other than those specifically contemplated in the agreement until 1972, eight years after the agreement was reached. It does not make sense that Hilltop and Marquette would have formed a conspiracy to monopolize or to drive Richter out of business in 1964, yet postponed until 1972 any anticompetitive conduct towards achieving that end. Thus, while defendants' claims of legitimate intentions are amply supported by the evidence, there is nothing in the

---

**18.** *See* Kintner II, Federal Antitrust Law § 14.1, p. 433 ("[O]vert acts in furtherance of the conspiracy, the probability of achieving monopoly power, and . . . the existence of a relevant market are not essential elements of the offense of conspiracy to monopolize."); *Id.,* § 14.2, p. 434 ("To establish the existence of an unlawful conspiracy to monopolize under Section 2 . . . a plaintiff must establish . . . (1) the existence of a conspiracy directed at an appre-

ciable part of interstate commerce and (3) undertaken with the specific intent of achieving monopoly power."); *and* Devitt and Blackmar, 2 Federal Jury Practice and Instructions § 55.29, p. 415 (1977) ("Under the law the act of conspiring constitutes the offense, and it is not necessary that the objective of the conspiracy be achieved, or that any overt acts be committed.").

record to suggest that defendants' motives in entering into the 1964 agreement were anything other than those set forth in the preamble. Even plaintiff's expert acknowledged the plausibility of such motives, and admitted he had no basis for concluding otherwise.

At this point, plaintiff's Section 2 conspiracy claim must fail, because there is no evidence whatsoever of any new or further agreement between the defendants to eliminate Richter or other competitors. The testimony is undisputed that Hilltop set its prices without consulting Marquette, and that Marquette had no input in determining Hilltop's pricing policies. Nor were there any discussions between defendants as to the sale of Old Richter and the emergence of New Richter, or as to what competitive or anticompetitive actions Hilltop should take in marketing its concrete. Furthermore, the evidence is undisputed that by 1972, Marquette no longer considered the 1964 agreement advantageous, and tried to negotiate its cancellation. The evidence demonstrates that one of the principal reasons for seeking cancellation was that Marquette was obligated by the agreement to sell cement to Hilltop at prevailing Greater Cincinnati market prices, which were not very profitable for Marquette. The evidence further shows that because of the low prevailing prices, Marquette wanted out of the Cincinnati market altogether. It cannot very well be argued that Marquette conspired with Hilltop to monopolize a market in which it no longer desired to do business.

Thus, there is no evidence that the defendants entered the 1964 agreement with the specific intention of driving Richter or other competitors out of business, and there is no evidence of any further agreement between the defendants. Therefore, plaintiff's Section 2 conspiracy claim must fail, if based upon the 1964 agreement, for want of evidence of specific intent to monopolize, and if based on anything else, for want of evidence of any agreement or concerted action. Accordingly, the Court directed a verdict against the plaintiff on that portion of its Section 2 claim as well.

## VI.

Plaintiff's second claim, arising under Section 1 of the Sherman Act, is that defendants "have agreed, combined and conspired with each other to restrain trade and commerce in the manufacture, sale and delivery of ready-mix concrete in the Greater Cincinnati Metropolitan Area." (Doc. 2, p. 4.) Plaintiff claims the 1964 agreement constitutes a contract, combination or conspiracy which served to restrain trade by encouraging Hilltop to engage in predatory pricing, thus forcing plaintiff and other competitors to either lose contracts to Hilltop or take them at a loss, and eventually causing plaintiff to go out of business.

As plaintiff presented its claims, this second claim is inextricably tied to the first, for the restraint allegedly imposed by the 1964 agreement is the encouragement it gave to Hilltop to engage in predatory pricing. In other words, the agreement restrained trade in violation of Section 1 because it encouraged Hilltop to violate Section 2. Accordingly, the parties dealt most extensively in their pleadings, memoranda, presentation of evidence and arguments with whether a Section 2 violation occurred, leaving the existence *vel non* of an unlawful restraint to depend upon a showing of a violation of Section 2. Thus, we could dispose of plaintiff's Section 1 claim quite simply by stating that since there is no substantial evidence to support a reasonable finding that defendants violated Section 2, there is no substantial evidence to support a reasonable finding that the 1964 agreement constituted a restraint of trade in violation of Section 1. We will, however, discuss plaintiff's second claim in more detail in this and the following section.

Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination . . . or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1. It is clear, however, that despite the literal language of the statute, not every business

arrangement which necessarily restrains the parties' full freedom of trading violates the prohibitions of Section 1. Since the earliest days, the courts have interpreted the statute as prohibiting only those contracts, combinations and conspiracies which unreasonably restrain trade or commerce. *Compare United States v. Joint Traffic Association,* 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898) *and United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897) (both of which construed the phrase "restraint of trade" literally, thereby declaring virtually every business contract a restraint, and hence, illegal) *with United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir. 1898), *affirmed,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899) (applied a test of reasonableness in determining whether a restraint was unlawful, and from which opinion the present "rule of reason" standard evolved).

To establish a violation of Section 1, therefore, three elements must be shown: (1) a contract, combination or conspiracy; (2) affecting interstate commerce; and (3) an unreasonable restraint of trade. *Mowery v. Standard Oil of Ohio,* 463 F.Supp. 762, 765 (N.D.Ohio 1976), *affirmed,* 590 F.2d 335 (6th Cir. 1979).

Plaintiff has unquestionably established the first two elements. The 1964 Hilltop-Marquette agreement, the existence of which is undisputed, is a contract, and, affecting as it does the Greater Cincinnati ready-mix concrete market, is one arising in or affecting interstate commerce. The sole question, then, is whether substantial evidence exists to show that the 1964 agreement imposed any unreasonable restraint of trade on the Greater Cincinnati ready-mix concrete market. We conclude that it does not.

A contract may be an unreasonable and therefore illegal restraint of trade (1) because it constitutes a *per se* violation of the statute or (2) because an unreasonable restraint of trade is either its object or effect. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct.

872, 883, 97 L.Ed. 1277 (1953); *Cities Service Oil Co. v. Coleman Oil Co., Inc.,* 470 F.2d 925, 930–31 (1st Cir. 1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973).

The 1964 Hilltop-Marquette agreement is not a *per se* violation of the statute. Certain types of agreements are deemed to have such pernicious effects on competition or such utter lack of redeeming virtue that they are conclusively presumed to be unreasonable and violative of Section 1. *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Examples of such agreements or practices are horizontal price fixing, division of markets, resale price maintenance, tying arrangements and group boycotts. Generally, it is only after long and repeated dealings with a particular type of agreement or practice, through which the pernicious effects become manifest, that courts are willing to find a *per se* violation of the statute. The present agreement appears novel, and is unlike any of the above examples. No claim is made, nor do we think can be made, that it is an illegal contract *per se.* Therefore, the agreement violates Section 1 only if its object or effect was an unreasonable restraint of trade. *Searer v. West Michigan Telecasters, Inc.,* 381 F.Supp. 634, 638 (W.D.Mich.), *affirmed,* 524 F.2d 1406 (6th Cir. 1975); *see also Times Picayune Publishing Co., supra,* 345 U.S. at 614, 73 S.Ct. at 883; *Cities Service Oil Co., supra,* 470 F.2d at 930–31.

We have already discussed at length the evidence relating to the object or purpose of the 1964 agreement. It was not to impose any unreasonable restraint of trade. The object of the agreement was for Hilltop and Marquette to secure and enhance their respective market positions in the face of the Richter-River Fuel Corp. combination. This was to be done on Hilltop's part by obtaining financing to implement its five-year growth program and securing a steady source for cement, and on Marquette's part by securing a strong and steady Cincinnati-area customer. There is no evidence to show that the defendants had any purposes

in mind other than those stated in the agreement itself. There is no evidence to show that the object of the agreement was to allow or encourage Hilltop to engage in predatory pricing, to restrain competitors generally, or specifically to drive Richter or other competitors out of the market. Given the competitive situation existing in 1964, the only reasonable conclusion to be drawn from the evidence is that the object of the agreement was to protect Hilltop and Marquette from the Richter-River Fuel Corp. combination, and thus to promote rather than restrain competition.

Absent any substantial evidence showing that the agreement was formed for anticompetitive or illegitimate purposes, we need only consider whether there is substantial evidence showing that it had a significant anticompetitive effect.

If, on analysis, the restraint is found to have legitimate business purposes whose realization serves to promote competition, the "anticompetitive evils" of the challenged restraint must be carefully balanced against its "procompetitive virtues" to ascertain whether the former outweigh the latter. A restraint is unreasonable if it has the "net effect" of substantially impeding competition.

*Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1183 (D.C.Cir.1978). Although ordinarily this involves a weighing of evidence, forbidden to the Court in ruling on a motion for directed verdict, we do not face that problem here, for there is no substantial evidence that the 1964 agreement either bore any "anticompetitive evils" or had the "net effect" of impeding competition.

The immediate effect of the agreement was to enable Hilltop to obtain financing for its five-year growth program. Pursuing its growth program, Hilltop acquired new plants, equipment and sources of aggregates, and boosted its percentage market share from approximately 30% to approximately 44% of the total. Then, over the life of the agreement, Hilltop held a contractual right to purchase a significant portion of its total cement requirements from Marquette at prevailing market prices. Marquette, in turn, was assured of a steady customer for its cement in the Greater Cincinnati market area. Finally, when Hilltop began losing money in 1974, its losses were effectively cut in half by Marquette's required payments under the loss makeup provision. These were the effects of the agreement.

Undeniable as these effects may be, they cannot seriously be considered unreasonable restraints of trade. Having obtained the necessary financing, Hilltop was able to purchase new plants and equipment and to maintain and modernize its old. In doing so, Hilltop substantially improved its competitive position and arguably diminished competitors' individual positions in like proportion. After all, a firm in a shared market cannot increase its percentage market share without causing a corresponding diminution in competitors' percentage market shares. But that is a far cry from saying that competition has diminished, or that there has been a negative effect on competition. The antitrust laws are not intended to discourage capital investment, even though such investment makes it less likely that some individual competitor will survive in the face of strengthened competition. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Cf.*, Areeda and Turner, *supra*, 88 Harv.L. Rev. at 718–720. The antitrust laws are concerned solely with the health of the competitive process, not with the fate of individual competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Atlas Building Products v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). Here, market shares among competitors were shuffled, but competition in the industry continued to thrive. There is no evidence that the loan guarantee provisions and Hilltop's subsequent implementation of its five-year growth program had the net effect of impeding competition. As in its Section 2

claims, plaintiff focuses on the 1964 agreement's ostensible effect on competitors instead of its effect on the competitive process, a focus not countenanced by the antitrust laws. *Id.*

Nor is there any evidence that the requirements portion of the agreement had a negative effect on competition. No claim is made that plaintiff or other competitors were unable to purchase cement from Marquette because of the obligation to sell cement to Hilltop. Further, there is no evidence that Hilltop gained an unfair price advantage over competitors as a result of its right to purchase up to 37.5% of its cement requirements from Marquette. All such purchases were at the prevailing market prices. Hilltop did not pay any less to Marquette for cement than it did to other suppliers, and we can assume, since all such purchases were at prevailing market prices, that Hilltop's competitors paid no more for their cement than Hilltop (Plaintiff's Exhibit 1140 supports this assumption). In any case, Hilltop's actual purchases from Marquette during the relevant period ranged from only 10 to 12% of its total cement requirements. At this low level of purchasing, any cost advantage Hilltop might have enjoyed for Marquette cement would have been insignificant in terms of the impact on Hilltop's total costs of production. Thus, no matter how viewed, the requirements portion of the 1964 agreement cannot have had any significant anticompetitive effect.

The only remaining effect of the 1964 agreement was that Hilltop's eventual overall losses were cut in half by Marquette's obligations under the loss-makeup provisions. And this effect did not occur until the end of the fiscal year ending February 28, 1975, long after plaintiff had gone out of business, for through most of the relevant period, at least through February 28, 1974, Hilltop's profits from its other operations exceeded its losses from its Cincinnati division. These profits precluded the loss-makeup provisions from having any effect on Hilltop's financial picture until after the close of the relevant period.

But for whatever effect the provision might have had during the relevant period, to be considered anticompetitive, Hilltop's losses from its Cincinnati ready-mix division must have been deliberately incurred, i.e., they must have resulted from Hilltop's predatory pricing. Otherwise, plaintiff's claim amounts to no more than a claim that because of the loss-makeup provision, Hilltop was better able to withstand competition. A company does not violate the antitrust laws simply because it is financially strong. Only from abuse of that strength does an antitrust violation occur. We have already determined that no substantial evidence exists showing that Hilltop abused financial resources by engaging in predatory pricing. The alleged anticompetitive effect, therefore, never materialized and does not exist. Absent any significant anticompetitive effect, the 1964 agreement is not an unreasonable restraint of trade, and does not violate Section 1.

Even if we assume that Hilltop engaged in predatory pricing, we would still direct a verdict in favor of defendants on plaintiff's Section 1 claim for want of evidence that such pricing involved the concerted action of defendants. Section 1 is not concerned with individual acts, no matter how anticompetitive, but requires some sort of deliberately coordinated or agreed upon behavior. *Overseas Motors, Inc. v. Import Motors Ltd., Inc.*, 375 F.Supp. 499, 531 (D.Mich.1974), *affirmed*, 519 F.2d 119 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). In order to show that Hilltop's wrongful use of the loss-makeup provision violated Section 1, plaintiff must show that such use was pursuant to some "unity of purpose, common design, or meeting of the minds," *Id.*, or *at least*, that it was such a reasonably foreseeable use that it might be considered a "natural consequence" of inclusion of the loss-makeup provision in the agreement. There is no evidence that the defendants agreed in 1964 that Hilltop would utilize the loss-makeup provision to engage in predatory pricing; there is no evidence that defendants subsequently came to any such agree-

ment; and there is no evidence that Marquette had any knowledge or involvement in Hilltop's price setting policies during the relevant period. Furthermore, we do not think that such an extraordinary and essentially self-destructive act as predatory pricing (in every case the predator must lose before it can possibly gain; in this case, Hilltop would not only have to lose money in its Cincinnati ready-mix division, but would also have to devour its profits from all its operations before it could gain a single penny from Marquette under the 1964 agreement) is any more natural or foreseeable a consequence of devising the loss-makeup provisions than that a firm might use the proceeds of an ordinary loan as a "war chest" for engaging in predatory pricing. In either case, the action is unforeseeable and, unless agreed upon, must be viewed as unilateral action beyond the reach of Section 1. For this reason also, the Court directed the verdicts in favor of defendants on the second count of plaintiff's complaint.

### VII.

Plaintiff's third and final claim is that:

14. Defendants constitute an unlawful "Trust" as defined in Section 1331.01 of the Ohio Revised Code. They have combined their capital, skill and acts to create or carry out restrictions of trade or commerce, to increase the price of ready-mix concrete, and to prevent competition in the manufacture, sale and delivery of ready-mix concrete in the Greater Cincinnati Metropolitan Area.

Although the Ohio Statute differs in wording from the Sherman Act, the aims of both statutes are similar. Like the Sherman Act, the Ohio Statute condemns combinations having for their purpose restraints on trade or commerce. *H. Lipman & Sons, Inc. v. Brotherhood of Painters,* 63 Ohio App. 157, 25 N.E.2d 852 (1939). Also, like the Sherman Act, the Ohio Statute prohibits only unreasonable restraints of trade. *List v. Burley Tobacco Grower's Co-Operative Asso.,* 114 Ohio St. 361, 151 N.E. 471 (1926). Contracts which are in restraint

of trade but are incident to some lawful business purpose and not unreasonable in scope or operation, are not illegal. *Id.* Given the similar aims of the statutes and the types of combinations they prohibit, we think that plaintiff's failure to prove its claims under the Sherman Act constitutes in this case a failure to prove the claim under Ohio Rev.Code § 1331.01. Accordingly, the Court directed verdicts in favor of defendants as to Count III of plaintiff's complaint.

### VIII.

As a final word, after long and careful study of plaintiff's evidence, the Court also concludes that serious deficiencies exist in plaintiff's proof of causation and damages. Although the Court did not direct verdicts in favor of defendants because of these deficiencies, and probably would not have done so were causation and damages the only issues, the existence and magnitude of these deficiencies make us more certain of the correctness of our decision.

Private antitrust actions are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" and recover treble the amount of his damages. Thus, proof that the antitrust laws were violated is not enough. In addition plaintiff must establish that such violation proximately caused injury to his business. *M. C. Manufacturing Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1063–64 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Terrell v. Household Goods Carriers Bureau,* 494 F.2d 16, 20 (5th Cir.), *rehearing en banc denied,* 496 F.2d 878, *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974).

Although proximate cause is an essential element of plaintiff's proof, the Court must observe the practical limits of the burden of proof an antitrust plaintiff can bear, and recognize that damage issues in antitrust actions "are rarely susceptible of the kind

of concrete, detailed proof of injury which is available in other contexts." *Zenith Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). In the absence of more precise proof, a plaintiff can be required to do no more than present evidence sufficient to permit a jury to "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure [plaintiff's] business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' acts had caused damage to the [plaintiff]." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *see also Zenith Corp., supra,* 395 U.S. at 123–124, 89 S.Ct. at 1576–77; *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 561–566, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 377–379, 47 S.Ct. 400, 404–05, 71 L.Ed. 684 (1927). Beyond this, a plaintiff need only present evidence sufficient to enable the jury to make a reasonable approximation of the amount of its damages. *Bigelow, supra,* 327 U.S. at 264, 66 S.Ct. at 579.

██ The basic flaw in plaintiff's proof of causation and damages stems from the broad, expansive nature of its claims. Plaintiff does not just claim that, defendants' conduct forced either a loss of contracts to Hilltop or acceptance of losing contracts. Moreover, plaintiff does not attempt to show the amount of profits lost as a result of losing or unprofitably winning any particular contracts. Ultimately, plaintiff claims that Hilltop's predatory pricing and the 1964 agreement forced plaintiff out of business altogether. As such, plaintiff seeks to lay responsibility for its entire operating losses during the relevant period and its entire loss of value as a going concern at defendants' feet.

The evidence, however, shows that significant portions of plaintiff's losses are attributable to causes other than defendants' conduct. Plaintiff had lost money during the period of its control by the River Fuel Co. long before Hilltop allegedly engaged in predatory pricing, and continued to lose money after the Collinwood acquisition. Plaintiff's losses during the winter months are as attributable to the fact that losses were typical in the industry at these times as to any other cause. Plaintiff's losses during the mixer truck drivers' strike, from June to August, 1974, are clearly due to the fact that Richter was not operating, and not to any conduct of the defendants. The list of jobs for which competitive information is known does not reveal a pattern of job bids in which plaintiff would have been better off even if Hilltop had not bid for them. A comparison of Hilltop's and plaintiff's costs and prices reveals that plaintiff still would have been forced, on the average, to lose contracts to Hilltop or to take them at a loss, even had Hilltop consistently priced at conclusively non-predatory levels. A comparison of plaintiff's costs to other firms' average price quotations reveals that even if Hilltop had left the market, plaintiff's high cost structure would have made it difficult, if not impossible, to compete. In short, a host of factors combined to create plaintiff's losses, and we cannot say "as a matter of just and reasonable inference" that defendants' conduct materially or substantially caused plaintiff's failure as a business. Although if we assume, which we may for purposes of this section, that defendants violated the Sherman Act, that the tendency of such conduct would have been to injure plaintiff's business, plaintiff's evidence of operating losses and loss of value as a going concern does not afford a reasonable approximation of the amount of damages. Thus, plaintiff failed to prove defendants' actions proximately caused the injuries claimed, and plaintiff failed to present evidence reasonably approximating the amount of damages actually suffered.

Looking to the 55 jobs for which competitive information is known, listed in the Appendix to this Opinion, there is only one instance where we can reasonably infer that plaintiff might have been better off had Hilltop's price quotation been higher or eliminated altogether. That one instance is

in paragraph 9, where plaintiff and Hilltop were the two lowest bidders. Had Hilltop's bid been higher or eliminated altogether, plaintiff might have raised its price to just below that of the third lowest bidder and still have won the contract. For the remaining 54 jobs, however, either the evidence shows that plaintiff would have fared no better, or the evidence is insufficient to permit an inference of causation.

The first thirteen jobs listed in the Appendix came from plaintiff's evidence of Hilltop's price quotations and job report forms. Hilltop's price quotations for 12 of these jobs may be definitely eliminated as the cause of any damage to plaintiff's business.

Hilltop's price quotations for six of these jobs could not have injured plaintiff's business because other companies quoted prices as low or lower than Hilltop's. (*See* Appendix ¶s 1, 2, 5, 6, 8, 10.) If plaintiff lost these contracts or took them at a loss, it was not due to Hilltop's prices, but the even lower (or in one instance, equally low) prices of other firms. Of course, plaintiff argues that other firms quoted such low prices in response to Hilltop's predatory prices, and, but for Hilltop's predatory prices would have raised their prices, giving plaintiff a better chance to compete. But even if we concede this possibility, there is no reason to assume that any firm quoting a price low enough to underbid Hilltop would not be equally willing to quote the same low price to underbid plaintiff. Plaintiff would have fared no better in these six instances even if Hilltop had not bid at all.

Hilltop's price quotations for another 4 of the first 13 jobs could not have injured plaintiff's business because intervening bidders quoted prices between Hilltop's and plaintiff's. (*See* Appendix ¶s 3, 4, 7, 12.) In each instance, Hilltop was low bidder, but some firm other than plaintiff was second low bidder. Thus, if plaintiff had not lost these contracts to Hilltop, it would have lost them to another firm, and would have been no better off even if Hilltop had not bid at all. *See M. C. Manufacturing Co., Inc., supra*, 517 F.2d at 1064.

Finally, Hilltop's price quotations for five of the thirteen jobs, including three of those already mentioned (¶s 5, 8, 10), could not have injured plaintiff's business because it does not appear that plaintiff even bid for them. (See Appendix ¶s 5, 8, 10, 11, 13.) Plaintiff cannot have been affected by Hilltop's price quotations unless it also bid for the jobs, and in these five instances, there is no evidence that it did.

Thus, plaintiff's evidence of Hilltop's price quotations and job reports reveals only one instance in which plaintiff arguably might have been better off had Hilltop's price been higher or eliminated altogether.

The competitive information for the remaining 42 jobs comes from defendants' Exhibit 582, introduced through their as-on-direct examination of Thomas Harrington. Hilltop's price quotations for 22 of these jobs may be eliminated as the cause of injury to plaintiff's business for one or more of the reasons discussed above. For the other 20 jobs, however, given the nature of Exhibit 582 and the manner in which it was compiled, no inferences may be reasonably drawn as to whether Hilltop's price quotation might have affected plaintiff's business in any way.

Hilltop's price quotations for 14 of the last 42 jobs listed in the Appendix may be eliminated as the cause of any injury to plaintiff's business because other companies quoted prices lower than Hilltop's. (*See* Appendix ¶s 14, 15, 16, 17, 18, 19, 29, 30, 34, 44, 45, 47, 49, 54.) If plaintiff lost these contracts or took them at a loss it was not because of Hilltop's prices, but because of the even lower prices of other firms.

Hilltop's price quotation for another of these jobs could not have injured plaintiff's business because an intervening bidder quoted a price above Hilltop's but below plaintiff's. (*See* Appendix ¶ 46.) If plaintiff had not lost this contract to Hilltop, it would have lost it to the intervening bidder.

Finally, Hilltop's price quotations for 10 of these jobs, three of which (those in paragraphs 15, 29 and 45) have already been

mentioned, could not have injured plaintiff's business because plaintiff did not bid for them. (*See* Appendix ¶s 15, 22, 29, 32, 35, 45, 48, 52, 53, 55.) Plaintiff cannot have been injured by Hilltop's price quotations on jobs for which it did not compete.

Because of the nature of Exhibit 582, and the manner in which it was compiled, no inferences may be drawn as to whether Hilltop's prices for the remaining 20 jobs might have affected plaintiff's business in any way. The exhibit was intended to demonstrate the effects of Hilltop's early 1974 price hike by showing that after it took effect, Hilltop lost a long series of job awards, and in many cases, lost them to plaintiff. To this end, the exhibit lists Hilltop's bid, plaintiff's bid and the successful bid. As such, the exhibit shows other companies' bids only when they bid successfully. Since plaintiff bid successfully on 18 of the last 42 jobs listed in Exhibit 582 (*see* Appendix ¶s 21, 23, 24, 25, 26, 27, 28, 31, 33, 36, 37, 38, 39, 40, 41, 42, 43, 51) and Hilltop bid successfully on another 2 of them (*see* Appendix ¶s 20, 50), third parties' bids for those jobs do not appear in the exhibit. But to say that Hilltop's price quotations for those jobs caused injury to plaintiff's business would require the assumption that where plaintiff bid successfully, no third company also underbid Hilltop, or, where Hilltop bid successfully, that no third company underbid plaintiff. If any third company was second low bidder, the causal connection between Hilltop's prices and plaintiff's loss would necessarily be broken. But given the number of competitors in the market, we believe the assumption that no third companies bid for any of these 20 jobs is an unreasonable one. And given the closeness of competition generally, and the frequent disparity between plaintiff's and Hilltop's prices for these jobs (in most cases the difference is over a dollar per cubic yard of concrete), we believe the assumption, that if there were third bidders they were not intervening bidders, is an unreasonable one. Note, we do not specifically rule out the possibility that Hilltop's price quotations for these 20 jobs injured plaintiff's business—we simply state that the

evidence to support such a reasonable inference is lacking. Any inference that Hilltop's price quotations for these 20 jobs caused injury to plaintiff's business would be based on speculation instead of evidence, and is therefore an inference plaintiff is not entitled to.

Thus, for the 55 jobs for which competitive information is known, Hilltop's price quotations for 34 jobs can be eliminated as the cause of injury to plaintiff's business. For another 20 of the jobs, the evidence is insufficient to either eliminate or reasonably support an inference that Hilltop's price quotations might have injured plaintiff's business. For only one of the 55 jobs can it be reasonably inferred that Hilltop's price quotations caused injury to plaintiff's business. This one instance is not enough to support a claim that Hilltop's prices forced plaintiff out of business altogether, and there is no evidence reasonably approximating the amount of damages flowing from this single, unprofitably taken contract.

Nor does the evidence of Hilltop's and plaintiff's comparative price-cost structures support a claim that Hilltop's predatory pricing forced plaintiff out of business. In a nutshell, plaintiff claims that because of Hilltop's predatory pricing, it was forced either to lose contracts to Hilltop or to take them at a loss, and that these losses eventually forced it out of business. However, the evidence adduced at trial reveals that the same would have been the case had Hilltop priced at conclusively non-predatory levels. Hilltop's average total costs over the relevant period were $19.88 per cubic yard of concrete, and any selling price at or above that level would be conclusively presumed non-predatory. Plaintiff's average selling price, however, was $19.95 per cubic yard, and its average total costs were $22.39 per cubic yard. Thus, even if Hilltop had raised its prices to conclusively non-predatory levels, plaintiff still would have been forced to lose contracts to Hilltop or to take them at a loss. Plaintiff virtually concedes this through its expert who testified that Hilltop would have undersold plaintiff on the

average without incurring losses had it sold its concrete at its average total cost. Recalling one of the central theses of plaintiff's case, that "in the long run, a price below average total cost will cause the firm to go out of business unless subsidized," (Plaintiff's Trial Brief, doc. 40, p. 7), plaintiff does not explain why this principle is applicable to Hilltop's business but not its own. The ultimate loss which plaintiff claims, namely the loss of its entire business, would have inevitably occurred regardless of Hilltop's prices. The cause would have been plaintiff's own high costs and prices. The most that can be gathered from a comparison of Hilltop's and plaintiff's relative price-cost structures is that if Hilltop had raised its prices to conclusively nonpredatory prices, plaintiff might have lost less money on certain contracts it took at a loss. But as for which contracts this might have been so, plaintiff's evidence reveals only one. (See Appendix, ¶ 9.) And as to the dollar amount of the loss on this one contract, there is nothing in evidence on which to base reasonable approximation.

A comparison of plaintiff's prices and costs to the evidence of other firms' prices casts further doubt on the proposition that Hilltop's prices substantially caused plaintiff's losses. In order to have avoided losing money, plaintiff would have had to sell its concrete at an average price of $22.39, a price sufficient to cover its total costs. Only towards the very end of the relevant period, from April to July, 1974, did any firm for which average price information is known quote prices anywhere near this level. (See D. Exh. 576.) If anything is clear from the evidence in this case, it is that given the stiff competition in the Cincinnati ready-mix concrete market, plaintiff could not have sold a cubic yard of concrete at a profitable price. Again, this evidence indicates that plaintiff's ultimate loss was caused, not by defendants' conduct, but by plaintiff's high costs and prices.

Finally, we think defendants correctly point to, and plaintiff incorrectly ignores, the effects of the unprofitable winter months, the mixer truck driver strike in the summer of 1974, and the unexplained causes of plaintiff's history of unprofitability as other substantial factors in the occurrence of plaintiff's losses. Together, these factors negate any reasonable inference that defendants' conduct was a substantial factor or material cause of plaintiff's failure as a business. Moreover, if we assume defendants violated the Sherman Act and injured plaintiff's business in some way, plaintiff has provided no evidence from which a reasonable approximation of the amount of damages from such injuries could be drawn. These deficiencies in plaintiff's proof of causation and damages go to all of plaintiff's claims, and although we did not direct the verdicts in favor of defendants because of these deficiencies, their existence and magnitude leave us more certain of our decision.

## IX.

To summarize briefly, plaintiff claims that Hilltop attempted to monopolize the Greater Cincinnati ready-mix concrete market by means of predatory pricing; that Marquette conspired with Hilltop, as evidenced by the 1964 Hilltop-Marquette agreement, in order for Hilltop to achieve that end; that the 1964 agreement, by encouraging and enabling Hilltop to engage in predatory pricing, constituted an unreasonable restraint of trade, and that it also constituted an unlawful trust under Ohio law. Plaintiff further claims that the defendants' actions proximately caused it to go out of the business of producing and selling ready-mix concrete.

With respect to the claim of attempted monopolization, plaintiff presented no substantial evidence that Hilltop specifically intended to monopolize the relevant markets, that Hilltop engaged in predatory pricing in furtherance of an intent to monopolize, or that Hilltop's conduct created any dangerous probability that monopolization could or would occur. Viewing the evidence as a whole, and affording plaintiff the benefit of all reasonable inferences therefrom, plaintiff failed to come forward with enough evidence to support a reasona-

ble finding that Hilltop attempted to monopolize the Greater Cincinnati ready-mix concrete market.

With respect to its claim that Hilltop and Marquette agreed, combined or conspired for Hilltop to monopolize the relevant market, plaintiff presented no substantial evidence that defendants entered the 1964 agreement with the specific intention of creating a monopoly, or that defendants came to any subsequent agreement, or took any concerted action to that effect. Viewing the evidence as a whole, and allowing plaintiff the benefit of all reasonable inferences therefrom, there is no substantial evidence to support a reasonable finding that defendants agreed, combined or conspired to monopolize the Cincinnati ready-mix concrete market.

With respect to its claim that the 1964 Hilltop-Marquette agreement constituted an unreasonable restraint of trade, plaintiff presented no substantial evidence either that defendants entered into the agreement for the purpose of restraining trade, or that the agreement had the net effect of impeding competition. Again, viewing the evidence as a whole, and allowing plaintiff the benefit of all reasonable inferences therefrom, there is no substantial evidence that the 1964 agreement imposed an unreasonable restraint on trade in the Cincinnati ready-mix concrete market.

With respect to its claim that defendants created a trust in restraint of trade in violation of Ohio law, plaintiff's failure to present substantial evidence in support of its federal claims amounts in this case to a failure to present substantial evidence in support of its state law claims. There can be no reasonable finding that defendants' business dealings with each other constituted an illegal trust as claimed.

For all of these reasons, the Court is duty bound to direct the verdicts in favor of defendants.

Finally, the Court concludes that serious deficiencies exist with respect to plaintiff's proof of causation and damages. Although the Court did not direct the verdicts in favor of defendants because of these deficiencies, their existence and magnitude render us more certain of the correctness of our decision.

An Entry of Final Judgment granting defendants' motions for directed verdicts will be filed and entered separately. Fed.R. Civ.P. 58.

SO ORDERED.

## APPENDIX

The following is a list of jobs for which Hilltop bid competitively with other companies and for which competitive price information is known. The competitive price information was developed principally through the testimony of Thomas Harrington, President of Hilltop Basic Resources. Hilltop's average monthly and yearly cost figures are from Hilltop's monthly operating statements (P. Exhs. 168–184, 193–196).

1. On October 25, 1972, Hilltop bid $17.50 per cubic yard (p.c.y.) for the Little Sisters of the Poor job, above its average direct costs (ADC)[1] for October of $16.40 p.c.y., and above its ADC for the fiscal year to date of $16.12 p.c.y. Both Richter and Plainville underbid Hilltop at $17.45 p.c.y., but for reasons apparently other than price, Reading won the contract at $17.70 p.c.y.

2. On November 6, 1972, Hilltop bid $18.25 p.c.y. for the Pilot Service Building job, below its ADC for November of $19.04 p.c.y., but above its ADC for the year to date of $16.32 p.c.y. Both Richter and Moraine underbid Hilltop with bids of $17.45 p.c.y. and $17.30—$17.50 p.c.y., respectively. Only Reading bid above Hilltop at $19.90 p.c.y. Richter won the contract.

3. On December 5, 1972, Hilltop bid $16.65 p.c.y. for the Hyde Park Plaza Shopping

1. Average direct costs include material costs, plant expenses, delivery expenses and idle plant expenses, but do not include selling and administrative expenses or corporate charges. Although referred to in Hilltop's monthly operating statements as "total costs," the term thus defined differs from the "total costs" as used throughout the body of this Opinion, which includes *all* costs.

Center job, below its ADC for December of $18.74 p.c.y., but above its ADC for the year to date of $16.47 p.c.y. Plainville bid slightly higher at $16.75 p.c.y., and Richter bid much higher than that. Hilltop won the contract.

4. On December 15, 1972, Hilltop bid $16.20 p.c.y. for the Children's Hospital Pavillion Building, below its ADC for December and for the year to date. Plainville bid higher than Hilltop at $16.50 p.c.y., and Richter bid higher than that. Hilltop won the contract.

5. On December 18, 1972, Hilltop bid $16.90 p.c.y. for the Leyman Manufacturing job, below its ADC for December, but above its ADC for the year to date. Reading initially bid $16.80 p.c.y., but after Plainville lowered its initial bid from $17.85 to $16.80 p.c.y., Reading lowered its price to $16.70 p.c.y. Reading won the contract.

6. On January 3, 1973, Hilltop bid $17.00 p.c.y. for the Cincinnati Country Day School job, below its ADC for January of $19.35 p.c.y., but above its ADC for the year to date of $16.67 p.c.y. Reading also bid $17.00 p.c.y., and Richter bid higher at $17.50 p.c.y. Plainville was the lowest bidder at $16.50 p.c.y., and won the contract.

7. On January 12, 1973, Hilltop bid $15.85 p.c.y. for the Ralston Purina Warehouse job, below its ADC for January and for the year to date. Reading bid slightly higher at $16.00 p.c.y., and Moraine bid $16.75 p.c.y. Richter bid highest of all at $17.10 p.c.y. Hilltop won the contract.

8. On January 15, 1973, Hilltop bid $17.00 p.c.y. for the Evercoat Fibreglass job, below its ADC for January, but above its ADC for the year to date. Although it is unknown what Hilltop's competitors bid, Hilltop did not win the contract. The job was awarded to Michael Concrete, which presumably bid lower than Hilltop.

9. On August 30, 1973, Hilltop bid $17.45 p.c.y. for the Christ Hospital Addition job, above its ADC for August of $16.47 p.c.y., but below its ADC for the year to date of $17.97 p.c.y. Both Richter and Reading bid higher than Hilltop at $18.50 and $18.75

p.c.y., respectively. Hilltop won the contract.

10. In August, 1973, Hilltop bid $19.70 and $21.00 p.c.y. for two grades of concrete for the Cincinnati Milacron job, well above its ADC for August and for the year to date. Reading submitted an identical bid, but Hilltop won the contract.

11. Also about this time, Hilltop bid $16.00 p.c.y. for the Hilton Inn, Sharonville, job. After being advised by the contractor that Moraine's price was under $16.00 p.c.y. (Reading's was slightly over $16.00 p.c.y.), Hilltop revised its bid to $15.85 p.c.y. and won the contract.

12. On October 11, 1973, Hilltop bid $18.30, $16.50 and $18.30 p.c.y. for three grades of concrete for the McAlpin's Warehouse job, all above its ADC for October of $16.45, but partially below its ADC for the year to date of $17.69 p.c.y. Reading bid $18.40, $16.70 and $18.20 p.c.y. for these same three grades of concrete, and Richter bid higher than that. Hilltop won the contract.

13. On October 26, 1973, Hilltop bid $18.55 p.c.y. for the Emery Air Freight job, above its ADC for the month and for the year to date. Tri-County bid $18.65 p.c.y., and Hilltop won the contract.

14. On January 8, 1974, Hilltop bid on three jobs, for two of which competitive information is known. For the Wilco Trucks job, Hilltop bid $20.20 p.c.y., well below its ADC for January of $24.12 p.c.y., but above its ADC for the year to date of $18.22 p.c.y. Richter submitted an identical bid of $20.20, but Moraine underbid them both at $19.90 p.c.y., and won the contract.

15. For the Queensgate II Town Center job, Hilltop bid $21.45 p.c.y., again below its ADC for January, but above its ADC for the year to date. Richter did not bid for this job, which Plainville won with a bid of $19.50 p.c.y.

16. On January 11, 1974, Hilltop bid $20.20 p.c.y. on the St. Bernard Elementary School job, below its ADC for January, but above its ADC for the year to date. Richter also bid $20.20 p.c.y., but Plainville underbid them both and won the contract.

17. On January 15, 1974, Hilltop bid for three jobs. For the Elberon Avenue street improvement job, Hilltop bid $21.80 p.c.y., below its ADC for January, but above its ADC for the year to date. Richter underbid Hilltop at $20.45 p.c.y., but Reading, between them at $21.20 p.c.y., won the contract.

18. For the Groesbeck Road improvements job, Hilltop bid $22.30 p.c.y., below its January ADC, but above its ADC for the year to date. Richter underbid Hilltop at $20.45 p.c.y., but again Reading, between them at $21.10, won the contract.

19. For the Fairmount Playfield swimming pool job, Hilltop bid $21.45 p.c.y., below its ADC for January, but above its ADC for the year to date. Richter submitted an identical bid at $21.45 p.c.y., but Reading underbid them both at $21.10 p.c.y. and won the contract.

20. On January 23, 1974, Hilltop bid $18.70 p.c.y. for the U. C. Parking Garage job, below its ADC for January, but still above its ADC for the year to date. Richter bid $20.00 p.c.y., and Hilltop won the contract.

21. On January 24, 1974, Hilltop bid $20.20 p.c.y. for the Irvin Company Warehouse job, below its ADC for January, but above its ADC for the year to date. Richter won the contract with a bid below $20.20 p.c.y.

22. On February 1, 1974, Hilltop bid on two jobs for which competitive information is available. For the Casinelli Square Shopping Center job, Hilltop bid $21.20 p.c.y., below its ADC for February of $23.44 p.c.y., but above its ADC for the year to date of $18.50 p.c.y. Richter did not bid on this job, which Reading won at a price of $20.20 p.c.y.

23. For the Panda Products Warehouse job, Hilltop also bid $21.20 p.c.y. Richter underbid Hilltop at $20.20 p.c.y. and won the contract.

24. On February 18, 1974, Hilltop bid $21.20 p.c.y. on the County Community Building, below its ADC for February, but above its ADC for the year to date. Richter underbid Hilltop at $20.20 p.c.y. and won the contract.

25. On February 19, 1974, Hilltop bid on three jobs for which competitive information is available. For the Krehbiel Co. Warehouse, Hilltop bid $21.20 p.c.y., below its ADC for February, but above its ADC for the year to date. Richter underbid Hilltop at $19.80 p.c.y. and won the contract.

26. For the Xomox Corp. Addition job, Hilltop bid $20.75 p.c.y., below its ADC for February, but above its ADC for the year to date. Richter underbid Hilltop at $19.80 p.c.y. and won the contract.

27. For the Turpin Senior High School job, Hilltop bid $21.95 p.c.y., below its ADC for February, but above its ADC for the year to date. Richter underbid Hilltop at $20.70 p.c.y. and won the contract.

28. On March 8, 1974, Hilltop bid $21.20 p.c.y. for the Strip Shopping Center job at Highland and Ridge Road, above its ADC for March of $20.29 p.c.y. and above its ADC for the previous fiscal year. Richter underbid Hilltop at $20.20 p.c.y. and won the contract.

29. Also on March 8, Hilltop bid $21.20 p.c.y. for the Steelcraft Mfg. Plant job, but Michael Concrete won the contract with a bid of $18.50 p.c.y.

30. On March 20, 1974, Hilltop bid $23.00 p.c.y. for the Merrill Labs Building 32 job, above its ADC for March and for the previous fiscal year. Richter bid higher at $23.10 p.c.y., but Reading underbid them both at $22.30 p.c.y. and won the contract.

31. On March 28, 1974, Hilltop bid on four jobs for which competitive information is known. For the Frank's Nursery—Hamilton Avenue job, Hilltop bid $21.20 p.c.y., above its ADC for March and for the previous fiscal year. Richter underbid Hilltop at $20.95 p.c.y. and won the contract.

32. For the Teamsters Local 100 job, Hilltop bid $21.50 p.c.y., above its ADC for March and for the previous fiscal year. Richter did not bid on this job, which Reading won at a price under $21.50 p.c.y.

33. For the New Prospect Baptist Church job, Hilltop bid $21.20 p.c.y., above its ADC for March and for the previous fiscal year. Richter underbid Hilltop at $20.20 p.c.y. and won the contract.

34. For the Mercy Hospital Garage job, Hilltop bid $22.95 p.c.y., above its ADC for March and for the previous fiscal year. Richter underbid Hilltop at $22.20 p.c.y., but Plainville underbid them both at $21.45 p.c.y. and won the contract.

35. On March 29, 1974, Hilltop bid $21.20 p.c.y. for the St. Bernard Firehouse job, above its ADC for March and for the previous fiscal year. Richter did not bid on this job, which Moraine won with a bid of $19.50 p.c.y.

36. Also in March, Hilltop bid $21.20 p.c.y. for the Eastern Avenue bus shelters job, above its ADC for March and for the previous fiscal year. Although Richter's bid was higher, it won the contract at $21.45 p.c.y.

37. On April 9, 1974, Hilltop bid $21.20 p.c.y. for the Frank's Nursery—Kenwood Road job, above its ADC for April of $20.17 p.c.y., and above its ADC for the fiscal year to date of $20.22 p.c.y. Richter underbid Hilltop at $20.95 p.c.y. and won the contract.

38. On April 23, 1974, Hilltop bid on two jobs for which competitive information is available. For the Music Hall Parking Lot and Pedestrian Bridge job, Hilltop bid $20.95 p.c.y., above its ADC for April and for the fiscal year to date. Richter underbid Hilltop at $20.45 p.c.y., and won the contract.

39. For the WCET studio job, Hilltop bid $23.00 p.c.y., above its ADC for April and for the year to date. Richter underbid Hilltop at $20.45 and won the contract.

40. On April 30, 1974, Hilltop bid on two jobs for which competitive information is known. For the Phillip Carey Warehouse job, Hilltop bid $21.20 p.c.y., above its ADC for April and for the year to date. Richter underbid Hilltop at $20.65 p.c.y. and won the contract.

41. For the City of Cincinnati job, Hilltop bid $23.95 p.c.y., above its ADC for April and for the year to date. Richter underbid Hilltop at $23.90 p.c.y. and won the contract.

42. In May, 1974, Hilltop bid on six jobs for which competitive information is known. For the Board of Education Building job, Hilltop bid $21.20 p.c.y., above its ADC for May of $19.91 p.c.y. and above its ADC for the year to date of $20.11 p.c.y. Richter underbid Hilltop at $20.20 p.c.y. and won the contract.

43. For the Williams Office Building job, Hilltop bid $21.20 p.c.y., above its ADC for May and for the year to date. Richter underbid Hilltop at $20.30 p.c.y. and won the contract.

44. For the Princeton Pike Warehouse job, Hilltop bid $21.20 p.c.y., above its ADC for May and for the year to date. Richter underbid Hilltop at $20.95 p.c.y., but Moraine underbid them both at $20.75 p.c.y. and won the contract.

45. For the Blue Ash Municipal Building job, Hilltop bid $21.20 p.c.y., above its ADC for May and for the year to date. Michael Concrete underbid Hilltop at $20.00 p.c.y. and won the contract.

46. Although Hilltop was apparently low bidder for the Cincinnati Milacron Building 3A job at $23.00 p.c.y., above its ADC for May and for the year to date, Reading won the contract with a bid of $23.45 p.c.y. Richter bid higher than both of them at $23.50 p.c.y.

47. For the Madeira High School Addition job, Hilltop bid $23.00 p.c.y., above its ADC for May and for the year to date. Richter underbid Hilltop at $22.50 p.c.y., but Moraine underbid them both at $22.00 p.c.y. and won the contract.

48. In June, 1974, the mixer truck drivers began their two month long strike, during which Hilltop produced no concrete. Accordingly, no direct cost figures exist for those two months. However, Hilltop and its competitors continued to bid for contracts to be performed upon resolution of the strike. Hilltop bid $21.20 p.c.y. for the Rish Equipment Co. job, but the contract was awarded to Moraine at $21.50 p.c.y. Richter did not bid.

49. Hilltop bid $23.00 p.c.y. for the Reading Road Police Station job. Richter underbid Hilltop at $22.20 p.c.y., but Plainville underbid them both at $21.45 p.c.y. and won the contract.

50. In July, 1974, Hilltop bid successfully for the OKI Systems job at $21.20 p.c.y., below Richter's bid of $22.90 p.c.y.

51. Hilltop and Richter both bid $21.20 p.c.y. for the Ryder Trucks job, and Richter won the contract.

52. Hilltop bid $35.10 p.c.y. for the U. C. Raymond Walters job, but Reading won the contract at $31.70 p.c.y. Richter did not bid.

53. Hilltop bid $21.20 p.c.y. for the Winton Hills Community Center job, but Moraine won the contract at $20.70 p.c.y. Richter did not bid.

54. Hilltop bid $22.85 p.c.y. for the Broadway Pedestrian Bridge job, below Richter's bid of $24.95 p.c.y. Moraine underbid them both at $22.00 p.c.y. and won the contract.

55. Finally, Hilltop bid $22.20 p.c.y. for the Polk Run Creek Pump Station job, but Moraine won the contract at $21.20 p.c.y. Richter did not bid.